# Richmond.

## J. W. DELLASTATIOUS AND OTHERS v. EUGENE BOYCE.

### March 21, 1929.

The opinion states the case.

*E. Hugh Smith, C. Harding Walker, Edwin H. Gibson* and *Wyndham R. Meredith,* for the plaintiffs in error.

*W. W. Butzner, Jos. W. Chinn, Jr.,* and *George Walker,* for the defendant in error.

CAMPBELL, J., delivered the opinion of the court.

This writ of error brings under review a judgment upon a verdict of a jury for $3,500 in an action of trespass on the case, brought by defendant in error against plaintiffs in error, to recover damages for an alleged illegal trespass and an alleged false arrest.

Boyce, plaintiff in the lower court, a resident of Westmoreland county, was a waterman by occupation, engaged in fishing and oystering, and lived in a dwelling

of which he was the owner, which dwelling was situated some distance from any village, town or city.

T. M. Arnest, a resident of Westmoreland county, was, prior to and at the time of the commission of the alleged grievances set forth in the declaration, a State prohibition inspector, appointed by the Attorney General of Virginia. Upon information that the plaintiff was violating the prohibition law by storing, keeping, selling and having in his possession contraband liquors, Arnest, after first orally stating under oath the grounds of his belief, procured from W. L. Gutridge, a justice of the peace of the county, a search warrant to search a dwelling in which it was alleged Boyce was violating the prohibition law. On October 10, 1926, Arnest instructed Luther Douglas, a citizen of said county, to procure for him some men, with directions to meet him at Carmel church, in said county, at two P. M. of that day, for the purpose of assisting him in the execution of a search warrant. Arnest did not tell Douglas how many men he wanted, nor whom he wanted, but did tell him that he wanted some of the men who had assisted him a week before in a raid on the premises of Bunny Johnson, in Richmond county, Virginia, for evidence of a violation of the prohibition law. Douglas told Eugene Pritchett and F. C. Barnes, of Westmoreland county, of Arnest's request, and also told Marvin King and Warren King, who reside in Northumberland county near the Westmoreland line. These latter men informed other men who lived in Northumberland county of Arnest's request. At two P. M., on October 10, 1926, all the defendants, twenty in number, met at the church. Arnest took them behind the church and there deputized the other nineteen to assist him in a search of Boyce's premises. The defendants then went to the dwelling of Boyce in automobiles.

Viewed as on a demurrer to the evidence, the case presented by the plaintiff, who testified as a witness in his own behalf, is as follows:

"I am fifty-two years old, a waterman by occupation, have lived in Westmoreland county for thirty-five years and am engaged in fishing and oystering and own my own home on Jackson's creek.

"On the 10th of October, which was Sunday, I was at my home all the morning, and as my son had gone away in my car it left no one at home but my wife, a small child and myself. In the early afternoon Mr. Wilford Wright came to my house. I asked him to go in the house, he said that he hadn't long to stay, that he had come to see if I could get some oysters for his wife, who was sick. I told him that I did not have any oysters so that I could get them.

"We were sitting on boxes in front of my garage talking, he had only been there a short time, when I noticed a large number of cars coming to my house, loaded with people. I did not know who they were or what they were coming for. They drove up into my yard and all got out, all of them armed with firearms, five or six had shot guns or rifles. I was surprised. I had no idea what they came for. Mr. Wright did not tell me that I was to be searched nor that anyone was coming to my house, and I had no idea who they were until Mr. Arnest got out of the car, at the same time two men with guns came with him and stood guard over me. Mr. Arnest then told me he had a warrant to search my place, and offered to read it to me. I told him it was not necessary to read it to me, but to go ahead and search anywhere he pleased.

"I certainly did not 'insist' on his searching my dwelling, I knew there was no liquor in it. There was no use in my objecting to it, as he had all those men

there. During my conversation with Mr. Arnest there he asked me about the path and the landing. I told him the path led down to the landing where I kept my boat though I did not tell him at that time that my land did not extend to the landing. Mr. Arnest left me still sitting on the box and started down the path towards the landing. He did not go all the way to the landing but turned and came back to me and told me to lift my foot up, he wanted to look at the bottom of my boot. I lifted up my foot and showed him the bottom of my boot. When Mr. Arnest left me and went down the path towards the landing the two men with guns still kept guard over me. I did not insist on them searching my house, though I did not object to it, but I called Mr. Arnest aside and whispered to him that I hoped they would not do anything to excite my wife, she was in a very delicate condition, being pregnant. He then told me that he would give me two good men to go with me to search the house. I told him that it was not my place to pick the men, and he asked me if I knew any of the men and I told him I knew Warren King, but I did not select King. Arnest then told Warren King and Harvey Lewis to search the house and told me to go with them, which I did.

"When we went in the house my wife and little girl were sitting in the dining room—they searched all through the kitchen and dining room and hall down stairs. I opened the closed door down stairs, and they looked into it, but did not go in the closet. They then went upstairs. There are three rooms downstairs and the kitchen, and three rooms upstairs, making seven in all, and they searched them all.

"When they went upstairs I went with King in my daughter's bedroom, and Lewis went in my wife's bedroom—there was a bed, a trunk and a bureau in my

daughter's bedroom; King opened the bureau drawers and felt in them to find out if there was any liquor there—they turned up the bed and felt of that. King then told me to open my daughter's trunk—I thought it was locked but found it was not, and the top came off the trunk. King then put his hands to the very bottom of the trunk and towseled the clothes in it by lifting them up, etc. They threw the mattress on the beds back and tumbled up the bed clothing on every bed in the house. While King was in my daughter's room with me, Lewis was searching my wife's bedroom. King and I did not go in my wife's room. King went to the door—I did not go in to see what Lewis had done at that time and I did not know until after I returned from the Justice of the Peace. I then found that the room was in a mess, things torn up, and the soiled clothes that had been behind some of the furniture were thrown and scattered all over the floor. When we came down stairs my wife seemed greatly agitated, her face was redder than I ever saw it, she said, 'What are these men doing in my house?' I told her that they were searching for liquor. She said, 'I want them to get out of here. I don't allow liquor in my house. I keep a clean house.' They did not say anything to her. Just before we went out King said, 'Wait awhile —if we go out too quickly Mr. Arnest will think we have not searched properly.'

"I looked out in the yard and saw the armed men going all over my place, and said to King, 'Who is all the crowd anyway, who have come down here—they must be a bunch of Ku Klux.' We then went out in the yard, and then one of the men came to me and said Mr. Arnest told him to tell me to come down there where he was, they had found some liquor. I went, he showed me the liquor and where he had found it—I

told him it was not my liquor and I never knew it was there, and that the place he said he found it was not my land. I showed him the line between my land and the land where the liquor was found. The line is a wire fence, that divides my land from Mr. Sanford's. It certainly was not my liquor, and there are men in this court room who know it was not mine, and know whose liquor it was.

"They said they found the liquor under a bush not far from the path leading to the boat landing. When I was talking to Mr. Arnest I told him that I used this path in going to the landing and that other people used the path also. He asked for what purpose. I told him the people who lived on the other side of Jackson's creek—that they would come that way rather than have to go around the head of the creek. He asked me to point out the path across the marsh. I showed him the path where it crossed the marsh. He claimed he could not see it. The tide was high at that time and it did not show as plainly as at other times, but the path was there and they could have seen it if they had wanted to. They were searching my place about two hours.

"Mr. Arnest placed me under arrest and told me he was going to take me to a justice of the peace. I told Mr. Arnest that my car was not at home, but would soon be there. Mr. Arnest said he could not wait for the car, we would have to go. Something was said about my having to give bail, or go to jail, and Mr. Arnest asked who I could get. I told him I wanted to get my neighbor, Mr. Davis. Then Mr. Arnest sent one of the men for Mr. Davis, who lived only about one-half mile from my house. Mr. Davis came and went to Justice Tayloe's and went my bail. I was ordered to get in one of the cars, and the crowd

took me over the public road to Justice Tayloe's, a distance of six or seven miles. It was Sunday evening and there were people traveling along the road, and assembled at various places, who saw the procession. I felt terrible. I felt that everyone who saw us thought I had done something that was terrible. I can't describe just how badly I felt. People were inquiring what it all meant. We got to Justice Tayloe's, the crowd parked the cars in front of his home. We had to wait there quite awhile before Justice Tayloe came. I was then taken before him and he put me under bond to appear before the circuit court, where I later appeared, but was not indicted and was discharged. These men did not take me back home, they planned to take me to Carey's Corner, part of the way, and there let me get home the best I could, but my son had found out where they had taken me, and came after me and took me home. When I got there I found my wife upstairs in her room, sitting on the springs of the bed crying, the bedding and bed clothes were turned up, and around, the furniture in her room moved from where it belonged, and things scattered about, dirty clothes all over the room. She was crying, saying what a terrible thing this was—'our home is broken up and people will never think the same of us again—they will look down on us.' I couldn't quiet her. She stayed in that room, she never came out of the house, except the next morning she got a piece of beef from the man who came selling meat, took it in the kitchen, went back to her room and never again came out until the undertaker brought her body out twenty days afterwards. About ten days after the search she had a 'spot,' she had had consumption, and had been to a sanatorium. She lived twenty days. ·Before that she did all of her work, cooking, washing and housekeeping.

The first two nights after this raid she was so upset she couldn't sleep and I was awake, trying to look after her. The third night, I from lack of sleep and being up, could not stand it any longer and fell asleep."

It is assigned as error that the court erred in not sustaining the following demurrer to the declaration:

"The plaintiff alleges that he has suffered damages on account of the death of his wife which he alleges was caused by the misconduct of the defendants; whereas the law does not permit an action for this cause to be brought except by the personal representative of the said wife; and that action, if brought, must be brought under the statute in such case made and provided, and not by a husband as such, for the benefit of the husband alone."

The action brought by the plaintiff, Boyce, is a common law action for an alleged unlawful trespass by defendants upon his property on October 10, 1926, and for his alleged unlawful arrest, upon a false charge of violating the prohibition law. The declaration alleges, *inter alia*, that the defendants, by their conduct, so terrified the plaintiff's wife, who was *enceinte*, that she soon after said search sickened and died.

The argument advanced by the defendants is, that since this is not an action under the statute for unlawful death, but simply a common law action for an alleged trespass upon property, and for an illegal arrest, it was error to allege injury to or death of plaintiff's wife. The court sustained the demurrer, in part, and ordered stricken from the declaration the allegation, "* * and also by reason of said defendant's unlawfully invading his dwelling, home and premises, and in the frightening and terrifying of his wife, who died on November 1, 1926, said plaintiff has lost the association, services and consortium of his said wife."

In this connection we will, for the sake of brevity, consider the alleged kindred error, that the court permitted counsel for plaintiff to ask, and permitted plaintiff to state, the physical condition of his wife before and after the search of his premises.

The position assumed by the learned trial judge was, that while plaintiff could not in this action recover for the alleged injury to or death of his wife, yet the plaintiff could allege and show the effect (if any) upon the physical condition of the wife caused by the conduct of defendants, as an element of damages affecting the recovery of plaintiff for injury to plaintiff's feelings and disturbance of his family. This view of the court was several times impressed upon the jury whose duty it was to obey the instructions of the court. It must be borne in mind that this is not an action by a personal representative to recover damages for the death of his decedent. In that case, the mental suffering of the decedent is not an element of damage. *Virginia Iron, etc., Co. v. Odle's Adm'r*, 128 Va. 280, 105 S. E. 107. In the instant case, the damages claimed are in part based upon the elements of disturbance of plaintiff's family status and his injured feelings.

In 35 Cyc., page 1277, it is said: "Damages for unlawfully entering and searching the premises of another are injuries to property, to plaintiff's feelings and disturbance of his family;  *  *."

In 24 Ruling Case Law, page 727, it is said: "In estimating the damages recoverable for a wrongful search and seizure, injury to a person's property, reputation and feeling may be taken into consideration."

If the evidence of the plaintiff be true—and that is a pure jury question—the conduct of the defendants (if the jury should find that there was an abuse of power

upon their part) entitled him to damages for any mental anguish he may have suffered, as well as any damages suffered by reason of the disturbance of his family. There is no merit in this assignment.

It is also alleged as error that over the objection of the defendants the court instructed the jury, "that the gist of the action in this case is the unlawful search of the plaintiff's home and premises and the illegal detention of the person without lawful process." In giving this instruction the court concluded the question of the legality of the search warrant and held the same to be illegal and void and the search made thereunder to be unlawful. The warrant issued by the magistrate is as follows:

"Commonwealth of Virginia,

"County Westmoreland, to-wit:

"To the Prohibition Inspectors, Sheriffs, Sergeants, and all Police Officers and Constables of the State of Virginia—Greeting:

"Whereas T. M. Arnest, S. P. A. of the said county has this day made complaint and information on oath before me, W. L. Gutridge, J. P. of the said county that he verily believes, that in the said county and State:

"(a) That Ardent Spirits are being unlawfully manufactured, sold, kept, stored, possessed, held, used and concealed in a certain dwelling, outbuildings or premises by one Eugene Boyce.

"(b) A still, still cap, worm, tubs, fermenters and other appliances connected with such still and used, and mash and other substances, capable of being used, in the manufacture of ardent spirits, are unlawfully in the possession of, and unlawfully used by one Eugene Boyce in a certain dwelling, outbuildings or premises.

"(c) Ardent spirits are being unlawfully kept, held,

stored, concealed, used, sold, and unlawfully transported in certain baggage or a certain vehicle, to-wit: a certain...................., by one.........

"And there being reasonable cause for such belief:

"These are, therefore, in the name of the Commonwealth of Virginia, to command you, with all necessary and proper speed and assistance, to search the house, place, baggage, boat or vehicle herein designated, either in day or night, and seize such ardent spirits and their containers and other things apparently possessed and used in violation of law, and bring the same and the person or persons, in whose possession they are found, and also any person resisting, impeding, obstructing, or in any manner hindering or delaying you in the execution of this warrant before me, or some other officer having jurisdiction of the case, to be disposed of and dealt with according to law; and make return of this warrant showing all acts and things done thereunder, with a particular statement and sufficient description of the things seized and the name of the person in whose possession found, if any, and if not found in the possession of any one, so state in your return, and post a true copy of this warrant and the return thereof, as required by law.

"Given under my hand and seal this 1st day of October, 1926.

(Signed) W. L. Gutridge (Seal)
Justice of the Peace."

Counsel for plaintiff contends that this action of the court is without error, because the warrant does not designate, "(1) whose dwelling, outbuildings or premises; (2) the location of the dwelling, outbuildings or premises; (3) any specific place to be searched."

The Fourth Amendment to the Constitution of the United States provides: "The right of the people to

be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon proper cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The Virginia Constitution, Article I, section 10, uses this language: "That general warrants, whereby an officer or messenger may be commanded to search suspected places without evidence of a fact committed, or to seize any person or persons not named, or whose offense is not particularly described and supported by evidence, are grievous and oppressive and ought not. to be granted."

Section 4822-a of the Code inhibits the issuance of a general search warrant for the search of a house, place,. compartment, vehicle or baggage.

The language of the Fourth Amendment to the Federal Constitution contains an inhibition against unreasonable searches and seizures and specifically provides that no warrant shall issue without particularly describing the place to be searched. The Virginia Constitution inhibits the issuance of general warrants,. and provides that the offense and the person directed to be seized shall be particularly described.

In Archbold's Crim. Pl. & Pr. (8th ed.), 131, it is. said: "The proceedings upon search warrants should be strictly legal, for there is not a description of process known to the law, the execution of which is more distressing to the citizen. Perhaps there is none which excites such intense feeling in consequence of its humiliating and degrading effects."

Until the passage of the State and Federal prohibition laws, the use of this extreme process was rarely resorted to. That it has become necessary to resort.

to this legal instrumentality, if our respect for law and order is to be preserved, is made manifest by the innumerable instances of the violation of the constitutional provisions and statutory enactments in regard to intoxicating liquors.

Section 4675, (31), of the Code provides: "If there be complaint on oath that ardent spirits are being manufactured, sold, kept, stored, or in any manner held, used, or concealed in a *particular house*, or other place, in violation of the law, the justice of the peace, police justice, circuit or city judge and mayor, of any city or town, to whom complaint is made, if satisfied that there is a reasonable cause for such belief, shall issue a warrant to search such house, or other place, for the ardent spirits.   *   *   *"

"Nothing here contained shall be construed to permit the issuance of general warrants, whereby an officer may be commanded to search suspected places without evidence of a fact committed, or to seize person or persons not named, or whose offense is not particularly described and supported by evidence."

There is no question that the rule is that every essential requirement of the organic or statutory provision must be fully met.   Under our statute, the complaint must be on oath, and the justice of the peace, before issuing the warrant, must be satisfied that there is a reasonable belief that ardent spirits are being manufactured, sold, kept, stored, or in any manner held, used or concealed in a particular house, or other place, in violation of the law.

In *Marshall* v. *Commonwealth*, 140 Va. 541, 125 S. E. 329, it is held that in order to justify an officer in executing a warrant of search he must be in a position to show that such act is warranted by law.   While it is incumbent upon the officer to submit the facts upon

which the search warrant is predicated, the onus is upon the magistrate to determine whether or not such complaint is based upon probable cause.

In *U. S.* v. *Borkowski*, (D. C.) 268 Fed. 410, it is said: "A search warrant may issue only upon probable cause, supported by oath or affirmation. The question of probable cause must be submitted to the committing magistrate, so that he may exercise his judgment as to the sufficiency of the ground for believing the accused person guilty." 25 Am. & Eng. Ency. Law, 147.

In *Zimmerman* v. *Bedford*, 134 Va. 800, 115 S. E. 365, Sims, J., quotes with approval the language of Lord Mansfield in *Money, et als.* v. *Leach*, 3 Burr. 1766: "It is not fit that the receiving or judging of the information should be left to the discretion of the officer. The magistrate ought to judge and should give certain directions to the officer."

Let us now consider the question: Is the warrant invalid for the reasons stated by counsel for the plaintiff?

In *United States* v. *Borkowski, supra*, it is said: "In describing the place to be searched, it is sufficient if the officer to whom the warrant is directed is enabled to locate the same definitely and with certainty. This does not require the exact legal description to be given, such as ordinarily appears in deeds of record in the county recorder's office. The description may be such as is known to the people and used in the locality in question, and by inquiry the officer may be as clearly guided to the place intended as if the legal record description were used. In 19 Enc. of Pl. & Pr. 329, it is said that a designation which identifies with reasonable certainty the place or places to be searched is sufficient, as by describing the house as of a certain.

number on a certain street and as occupied and owned by the named person; but the description as to ownership must be such as to identify certainly the place to be searched, and a misdescription in this regard will render the warrant void."

In *Rothlisberger* v. *United States*, (C. C. A.) 289 Fed. 73, it is said:

"PER CURIAM: The plaintiffs in error, father and son, were convicted of having in their possession, with knowledge, property which had been stolen while in interstate transportation, and of having thereby violated section 1 of the Act of February 13, 1913, (37 Stat. 670, U. S. C. S. 8603 [18 U. S. C. A. section 409]).

"A search warrant, which formed the basis for admitting certain evidence, is attacked because the property to be searched was identified only by giving the street and (an erroneous) number, and because the person named therein was neither the householder nor the owner of the premises. The building searched, 121 Hay street, was a single family residence, occupied by the Rothlisberger family, and owned by the mother, and L. Rothlisberger, the person named in the warrant, was a member of that family, an adult son living there. The warrant gave the number as 123. There is nothing to show that there was any building No. 123, or any room for doubt as to the house intended.

"We find no justification, upon principle or authority, for thinking that the proceedings under the search warrant were unlawful for either of these reasons."

In *Steele* v. *United States*, 267 U. S. 498, 45 S. Ct. 414, 69 L. Ed. 758, Mr. Chief Justice Taft said: "It is enough if the description is such that the officer with the search warrant can, with reasonable effort, ascertain and identify the place intended."

Turning to the warrant heretofore set forth, let us

see if it meets all legal requirements. The caption of the warrant is: "Commonwealth of Virginia, county Westmoreland." It is issued by a magistrate of Westmoreland county on the complaint and information on oath of T. M. Arnest, a prohibition officer. It sets forth that in said county "ardent spirits are being unlawfully manufactured, sold, kept, stored, possessed, held, used and concealed in a certain dwelling, outbuilding or premises by one Eugene Boyce." The warrant itself establishes the fact that the dwelling to be searched is situated in Westmoreland county. It is argued, however, that "the warrant does not say the dwelling of Eugene Boyce, or Eugene Boyce's dwelling, or the property occupied by Eugene Boyce, but leaves it so general that it might mean any dwelling, outbuildings or premises in the county * *." This is indeed a too narrow construction. Webster's International Dictionary defines a dwelling thus: "Habitation place or house in which a person lives; abode; residence; domicile." A person may be the owner of numerous dwelling houses, but he can only make use of one of them as a dwelling at one and the same time.

In *Wright* v. *Dressel*, 140 Mass. 147, 3 N. E. 6, the language construed is, "the house and premises of Elias Dressel of Granby in said county of Hampshire." Justice Holmes, then a member of that court, held: "As Elias Dressel is described as of Granby, that is as residing there, if the warrant means the dwelling house occupied by him, the house of course must be in Granby and the place is properly described."

In *Marshall* v. *Commonwealth, supra*, the pivotal question was the validity of the affidavit upon which the search warrant was based. The affidavit reads thus: "This affidavit, among other things, sets forth that 'whereas J. L. Dirting, Chief Federal Agent of

said county, has this day made complaint and information on oath before me, F. J. Argenbright, J. P., * * * states * * * (a) ardent spirits are being unlawfully manufactured, sold, kept, stored, possessed, held, used and concealed in a certain dwelling house and outbuildings by one Tom Marshall, located at Mt. Clinton.' "

The only material difference between the affidavit which was held to be valid and the warrant in the instant case is found in the words, "located at Mt. Clinton."

It is stated in the brief of counsel for plaintiff that "if the warrant had read 'the premises of Eugene Boyce on Jackson creek,' we might be doubtful of our contention." If it should appear as a fact that Jackson's creek is a well defined stream which runs the entire length of Westmoreland county, the description "on Jackson's creek" would not be any more descriptive than "in Westmoreland county."

While the immunity granted by the Constitution should be preserved as intended, it is inconceivable that those who framed the organic law meant that a search warrant should be letter perfect. The warrant in issue, though not a model which should be followed in the future, does, in our opinion, contain all the essential allegations required by law. The ruling of the trial court that it was invalid constitutes reversible error.

It is also assigned as error that the court erred in giving, upon motion of the plaintiff, the following instruction: "The court instructs the jury that the search warrant in this case, of date October 1, 1926, was illegal and void, and the officer, T. M. Arnest, and such of the defendants who were not from Westmoreland county who took part or aided in searching the

dwelling, outbuildings or premises of Eugene Boyce on October 10, 1926, then and there by him occupied, were volunteers and trespassers, and are liable to the plaintiff in both compensatory and punitive damages, if the jury find under the other instructions given in this case that the plaintiff is entitled to recover punitive damages.''

In this connection we will consider the assignment of error which deals with the refusal of the court to give, upon motion of the defendants, the following instructions:

"The court instructs the jury that when a person is called upon by an officer to assist him in making an arrest or executing a search warrant, he can not refuse to act until he is satisfied that the officer is acting legally. He is protected by the official character of the officer so long as he confines himself to the order and direction of the officer, although the arrest proves to be illegal and the warrant under which the officer is acting proves to be invalid.

"And if the jury believes from the evidence that T. M. Arnest was an officer of the Prohibition Department of the office of the Attorney General of the Commonwealth of Virginia, and as such duly authorized to execute warrants of arrest and search and seizure for the violation of the prohibition laws of the Commonwealth, and that the defendants other than himself were deputized by him to assist in the execution of the warrant described in the declaration and introduced in evidence, and that they confined themselves to the execution of orders and directions of the said officer in a reasonable and proper manner; then the court instructs the jury that they can not be held liable for any damages in this action, although the

warrant proved to be invalid because of its failure to describe the property to be searched, and they must find for such other defendants.

"The court instructs the jury that a State prohibition inspector has the right to summon for assistance in executing process, citizens from any county in the State and persons so summoned, though not residents of the county in which process is to be served or executed, do not act officiously and illegally simply because they live in some other county than that in which the process is to be executed.

"The court instructs the jury that a State prohibition inspector, such as the defendant, T. M. Arnest, is, has the right to summon for assistance in executing process citizens from any county in the State who happen at the time to be within the county in which the said process is to be executed; and persons so summoned, though not residents of the county in which such process is to be executed, do not act officiously or illegally simply because they live in some other county than that in which the process is to be executed."

It appears from the record that a majority of the defendants were not residents of Westmoreland county.

■ In giving the instructions requested by the plaintiff, the trial court evidently had in mind section 2822 of the Code. That section provides that an officer may "in case of resistance made or apprehended, summon so many of the people of his county or corporation * * * as may be sufficient." This section appears in chapter 112 of the Code, the title of which deals specifically with sheriffs, sergeants, coroners and constables. The words in the statute "his county" are directory and not mandatory, for it is also provided by a subsequent statute, section 4825, that if a person charged with an offense shall, at the time

the warrant is issued, escape from or be out of the county in which the offense is alleged to have been committed, the officer to whom the warrant is directed may pursue and arrest the alleged criminal anywhere in the State. Let us assume, for the sake of argument, that Boyce, who was charged in the warrant with a violation of the prohibition law, had, upon the approach of the officer, made his escape into the adjoining county of Richmond. Is it not futile to argue that the officer who was in hot pursuit must halt in his efforts to effect an arrest when he reached the county line and return to the county of Westmoreland and there summon assistance, if he apprehended resistance, or else be out to the trouble and delay of going through the formal process of organizing a *posse comitatus*? We are of opinion that under such circumstances, he would be acting within the scope of his authority if he should summon the man in hand, even though he be a citizen of the remote county of Lee, and with his assistance effect the arrest.

There is another aspect of the question which should be considered. Realizing, no doubt, that the successful enforcement of the prohibition law depends upon the use of stern efforts, and in order to supplement the activities of the local officers, the legislature has by section 4675 (93), of the Code, provided for the appointment by the Attorney General of inspectors whose duty it shall be to aid in the faithful execution of the prohibition law. Arnest was a duly appointed inspector. By virtue of his appointment he is vested with all the powers of a sheriff, the exercise of which is not, however, confined to any one county. It is conceded by counsel for the plaintiff that a prohibition inspector is empowered to make a legal arrest anywhere in the State. It is argued, however, that "when he

calls for aid from the private individuals his power is restricted by law to that of local or county officer."

. To hold that the provisions of section 2822 of the Code are mandatory and applicable to a prohibition inspector would lead to the same anomalous result that it does in the case of a sheriff or constable. The law does not require an inspector, sent by the Attorney General of the State to apprehend violators of the prohibition law, residing remote from *his county*, to return to *his county* for assistance in case of apprehended resistance. Such was not the intention of the legislature, and it was error to instruct the jury, as a matter of law, that those defendants who were non-residents of Westmoreland county were volunteers and trespassers. It follows that the defendants are entitled to proper instructions setting forth their theory of the case.

The fourth assignment of error challenges the ruling of the trial court in refusing to permit counsel for defendants to ask the plaintiff, on cross-examination, whether he had not, both before and after October 10th, been in the habit of bringing liquor from the State of Maryland and selling it in Westmoreland county.

This action of the court is without error. When the question was propounded, the court advised the plaintiff that he could not be compelled to give evidence which might incriminate him. It would have been proper to admit evidence of the general bad character of the plaintiff in mitigation of damages, but it is highly improper to permit evidence of specific acts. The question of privilege is equally applicable in a civil or criminal proceeding.

In 28 R. C. L. 425, it is said: "* * * that the privilege of a witness not to give self-incriminating

evidence is not limited merely to criminal proceedings wherein the witness is the defendant, but can be invoked in any judicial proceeding.  *  *  *  A person suspected of a crime could be proceeded against civilly and compelled to disclose the very facts essential to a conviction, leaving him practically without any privilege whatever."

The next assignment of error calls in question the action of the court in requiring Inspector Arnest to disclose from whom he obtained the information upon which the search warrant was based.

In *Webb* v. *Commonwealth*, 137 Va. 833, 120 S. E. 155, Mr. Chief Justice Prentis said: "We observe, however, that it" (the assignment of error) "is based upon the refusal of the court to compel the officer, Leffel, who made the arrest, to disclose the name of the person who gave him the information which led to the issuance of the warrant to search the outbuilding belonging to the accused. This ruling was correct, and rests upon sound public policy which appears to have been long perfectly well settled."

In *Segurola* v. *United States*, 275 U. S. 111, 48 S. Ct. 77, 72 L. Ed. 186, one of the questions involved was the refusal of the trial court to allow the police officer to be cross-examined as to the name of the person who furnished him with the information that the defendant was engaged in transporting liquor in a Buick car. Mr. Chief Justice Taft, delivering the opinion of the court, for reasons stated, declined to pass directly upon the question, but in the course of the opinion did say: "*  *  *  the refusal to permit cross-examination of Cebellos worked no prejudice for which a reversal can be granted."

Counsel for plaintiff seek to sustain the action of the court by drawing a distinction between a criminal case

and a civil case. The holding in the *Webb Case* was based "upon sound public policy." Does the same rule prevail when the only object to be accomplished is an enhancement of the damages?

In the syllabus to *Sands & Co., Inc.* v. *Norvell*, 126 Va. 384, 101 S. E. 569, it is stated that it is the duty of every good citizen to give information to the officers of the law when they know of its violation. If, in order to enhance the damages of a litigant in a civil action, the good citizen is to be subjected to the hazard of an action for slander, or run the risk of physical or property injury, we surmise that very few people would discharge their legal duty by reporting to the law enforcement officers violators of the law which may come under their observation. The rule should be the same in criminal and civil cases. The reason given in the *Webb Case*, that the admission of evidence of this character is against public policy, should apply in the instant case. The court's ruling was erroneous.

■■■ The defendants sought to prove the general reputation of the plaintiff as a violator of the prohibition law. The court ruled that only the general reputation of the plaintiff was involved. This ruling was correct. In a criminal prosecution for a violation of the prohibition law, under our statute, it is permissible to prove the reputation of the accused as a violator thereof, but in a civil case the defendant is only concerned with the general character of the plaintiff, for the purpose of mitigating damages, and will not be permitted to prove particular derelictions.

■■ The last assignment of error calls in question the ruling of the court in permitting counsel for plaintiff to ask each member of the jury panel if he was a member of the Ku Klux Klan.

It appears from the record that nineteen of the

twenty defendants were members of that organization. The Klan is a secret organization, and the obligation to which a member subscribes is not in evidence. It is a matter of general supposition, however, that the obligation which a member of most secret organizations is required to take, while it does not extend to the commission of perjury to protect a brother, is intended to bind the members thereof in bonds of close fellowship.

Under our statute relating to the composition of a jury, a litigant is accorded the right to strike from the panel a designated number of prospective jurors. In order to fully exercise this privilege, it is essential that the litigant should possess full knowledge of the character of the juror who solemnly subscribes to the oath, "You shall well and truly try the issue joined between * * * plaintiff and * * * defendant, and a true verdict give according to the evidence. So help you God."

This assignment of error is without merit.

The judgment complained of must be reversed, the verdict of the jury set aside and the case remanded for a new trial, with direction to the trial court to empanel a jury to try the following issues: (1) Whether or not there was an abuse of power upon the part of the defendants in the execution of the search warrant; and, if answered in the affirmative, (2) the amount of damages, if any, the plaintiff is entitled to under the law.

*Reversed.*