# Staunton

TRI-PHARMACY, INCORPORATED, ET AL. v. UNITED STATES OF AMERICA, ET AL.

UNITED STATES OF AMERICA v. COMMONWEALTH OF VIRGINIA, ET AL.

August 31, 1962.

Record Nos. 5443, 5444.

Present, Eggleston, C. J., and Buchanan, Snead, I'Anson and Carrico, JJ.

*Carl J. Batter, Jr. (Karl G. Sorg; Carl J. Batter,* on brief), for appellants, Tri-Pharmacy, Incorporated, et al.

*Giora Ben-Horin (Claude V. Spratley, Jr., United States Attorney; Macdougal Rice, Assistant United States Attorney; Louis F. Oberdorfer, Assistant Attorney General of the United States; Lee A. Jackson; Joseph Kovner,* on brief), for appellant, United States of America.

*Giora Ben-Horin,* for appellee, United States of America.

*M. Harris Parker, Assistant Attorney General (Robert Y. Button, Attorney, General,* on brief), for appellee, Commonwealth of Virginia.

*Carl J. Batter, Jr. (Karl G. Sorg; Carl J. Batter,* on brief), for appellees, Tri-Pharmacy, Incorporated, Joseph A. Chase and Nannie C. Compton.

BUCHANAN, J., delivered the opinion of the court.

The questions presented by the appeals in these two cases are whether the Commonwealth had the right to forfeit certain money and other personal property on the ground that it was used in connection with the operation of a lottery, and whether such right, if established, is superior to the liens of the United States for taxes.

On October 21, 1957, officers of the Arlington county, Virginia, police department, possessed of a search warrant, entered the premises at 1800 South Cleveland street, Arlington county, and there seized the property in question. Thereafter, on February 10, 1958, the Com-

monwealth's attorney for Arlington county filed an information[1] which recited the seizure of the property in connection with the operation of a lottery, as listed on Exhibit A filed with the information, consisting of forty-six numbered items, and prayed that said property be condemned as forfeited to the Commonwealth and disposed of according to law.

On April 21, 1958, Tri-Pharmacy, Incorporated, Nannie V. Compton and Joseph A. Chase, the appellants in No. 5443, filed separate petitions, claiming to own various of the items and praying that they be returned accordingly. Tri-Pharmacy claimed $6,697.68, which was item 41 of the Exhibit, together with some corporate records and an adding machine. Mrs. Compton asked for the return to her of all the seized property except what might be returned to Tri-Pharmacy; and Chase prayed to have returned to him the $3,889 listed as item 44 of the Exhibit. Mrs. Compton alleged that she was the owner and occupant of the premises; that the search warrant was invalid; that the seized items were not contraband or unlawfully in her possession. Chase also alleged that the search warrant was invalid; that the $3,889 was not contraband or unlawfully in his possession, and that if any lottery was at any time conducted on the premises he had no knowledge of it.

Prior to the filing of these petitions, to-wit: on October 21, 1957, the date the premises were entered and the property seized, separate warrants were issued against Joseph A. Chase and Nannie V. Compton, charging each of them with operation of a lottery and having possession of lottery slips in violation of § 18-301 of the Code (now § 18.1-340, 1960 Replacement Vol.), and each on November 7, 1957, entered a plea of guilty to the charge and each was sentenced accordingly.

On April 2, 1958, the United States of America, appellant in No. 5444, filed its intervening complaint in which it alleged that in January, 1953, the Commissioner of Internal Revenue made an assessment of excise taxes against Joseph A. Chase and Nannie V. Compton in the total sum of $16,510.66, on the basis of wagers accepted by them during October, 1952; and that on November 4, 1957, the Commissioner made a jeopardy assessment of excise and occupational taxes against said Chase and Compton in the total sum of $75,167.39. on the basis of wagers accepted by them in the period of July, 1957, through October, 1957. It was alleged that notices of the assessments

---

[1] Code 1950, § 19-11; now §§ 19.1-358, *et seq.*, 1960 Replacement Vol.

were duly given and filed, and the complaint prayed that the United States be adjudged to have a lien on said seized property for the amount of said taxes prior and superior to the claims of all other claimants.

The evidence, which was voluminous and was accompanied by many exhibits, was heard by the trial court *ore tenus* and thereafter, on May 23, 1961, the order now appealed from was entered in which it was found and adjudicated as follows:

That "the evidence in this case clearly demonstrates that a lottery was being operated on October 21, 1957 and that part of the operation was being conducted at 1800 S. Cleveland Street, Arlington, Virginia, by both Nannie V. Compton and Joseph A. Chase, and that, on that date, the items 1 through 44 listed on Exhibit 'A' attached to and made a part of the information filed by the Commonwealth of Virginia, was used in connection with the promotion, operation or conduct of said lottery and was therefore, on that date, forfeited to the Commonwealth of Virginia";

And "that such forfeiture takes precedence over the claim of the United States Government for a tax lien upon said property."

It was further found and adjudicated that items 45 and 46 of Exhibit A, being two cloth bags containing together $1,229.11 and some small items, were not used in the operation of the lottery; that all parties had waived any claim thereto and that they be returned to Tri-Pharmacy, Incorporated; but that all of items 1 through 44, listed on said Exhibit A, were forfeited to the Commonwealth and to be disposed of as the law directs.

From this decree appeals were granted to Tri-Pharmacy, Incorporated, Nannie V. Compton and Joseph A. Chase, Record No. 5443; and to the United States of America, Record No. 5444, and the errors assigned by them raise the questions now to be considered.

## Record No. 5443

The principal contentions of the appellants in this case are (1) that the search warrant under which the seizure was made was invalid and that the evidence thereby procured was inadmissible; and (2) that the evidence admitted was not sufficient to support the findings of the court.

The affidavit which was the basis for the search warrant and the warrant itself are printed in the margin.[2]

Appellants' argument is that the affidavit was not sufficient to show probable cause.

Section 19-30 of the Code of Virginia, 1950 (now § 19.1-85, 1960

---

[Affidavit]

[2] Commonwealth of Virginia; County of Arlington, to-wit:

Before Me, John Dalonas Special Justice for the County aforesaid, this day appeared Det. Leonard J. Burnett and made affidavit as follows:

(1) Substantially the offense in relation to which search is to be made. Operation of a lottery, to wit, numbers game, in violation of Section 18-301 of the Code of Virginia.

(2) The material facts constituting probable cause for issuance of the warrant. Personal observation of premises and information from sources thought by the Police Department to be reliable.

(3) What is to be searched for under the warrant. Lottery tickets, including numbers slips, and any materials unlawfully made, provided or procured for drawing a lottery.

(4) The house, place, vehicle, or baggage to be searched. That certain premises known as 1800 South Cleveland Street, Arlington County, Virginia.

LEONARD J. BURNETT

Subscribed and Sworn To Before me this 21st day of October, 1957.

JOHN DALONAS
*Special Justice*

Certified to the Clerk of the Circuit Court of the County of Arlington.

JOHN DALONAS
*Special Justice*

11/6/57

[Search Warrant]

In the County Court of Arlington County, Virginia

*To the Sheriff or any Police Officer of said County:*

Whereas an affidavit has been filed with me pursuant to law and complaint made before me by Det. Leonard J. Burnett that a lottery, to-wit a numbers game is being operated in the premises described below, and that lottery tickets, including numbers slips and materials unlawfully made, provided or procured for drawing a lottery are believed to be concealed therein, and it appearing that there is reasonable and probable cause for such belief;

These are therefore to authorize and require you, in the name of The Commonwealth of Virginia, to enter in the day or night time the house, place, vehicle, or thing described as follows: All of a certain premises known as 1800 South Cleveland Street, Arlington County, Virginia and there diligently search for the said goods and bring the same and the person or persons in whose possession the same are found, before me to be disposed of or dealt with according to law.

Given Under My Hand and Seal this 21st day of Oct. 1957.

JOHN DALONAS
*Special Justice*

Replacement Vol.), provides that no search warrant shall be issued until the required affidavit is filed, reasonably describing the place or thing to be searched, the things to be searched for, and "alleging briefly material facts constituting the probable cause," and substantially the offense in relation to which the search is to be made.

Section 19-29 (now § 19.1-84) provides that on complaint, supported by the required affidavit, the justice or judge "if satisfied that there is reasonable cause therefor" shall issue a warrant to search the specified place for, *inter alia*, "Lottery tickets, or materials unlawfully made, provided or procured for drawing a lottery".

Section 19-33 (now § 19.1-88) forbids an officer or other person to search without a warrant, and makes it a misdemeanor to do so, and the officer shall be liable to compensatory and punitive damages to a person aggrieved, and for a second offense his office is forfeited.

In *Hall* v. *Commonwealth*, 138 Va. 727, 733, 121 S. E. 154, 155, we expressed the view that the purpose of these statutes (then embodied in Acts 1920, ch. 345, p. 516) was to protect and enforce the rights of the citizens guaranteed to them by Article I, § 10 of the Virginia Constitution;[3] and in *Zimmerman* v. *Bedford*, 134 Va. 787, 802, 115 S. E. 362, 366, we said that their requirements were the same in substance as those contained in the Fourth Amendment to the Federal Constitution.

In *Zimmerman* the challenged affidavit for the search warrant stated that the affiant believed that Zimmerman had liquor in his possession at a named place, and that affiant had "watched his place and from the nature of the people going in and out of his premises, I am satisfied he has liquor there". We held that this affidavit contained the material facts constituting probable cause for issuing the search warrant, and sufficient to have satisfied the officer issuing the warrant that there was reasonable cause for issuing it, in that

"* * It states that the affidavit is based on the personal observation of the affiant of the place designated and of the nature of the people going in and out of the premises. And these facts are in their character convincing evidence of the existence of probable cause (which is the same thing as reasonable cause) for the issuance of the search warrant." 134 Va. at 802, 115 S. E. at 366.

[3] § 10. General warrants of search or seizure prohibited.—That general warrants, whereby an officer or messenger may be commanded to search suspected places without evidence of a fact committed, or to seize any person or persons not named, or whose offense is not particularly described and supported by evidence, are grievous and oppressive, and ought not to be granted.

The controlling principle was stated to be that the evidence on which a search warrant may be issued "does not have to be sufficient to establish the fact that the thing sought is on the premises, but merely that the belief of the person making the affidavit that it is there is based on facts which furnish a probable or reasonable cause for such belief". 134 Va. at 802-3, 115 S. E. at 366. See also *Marshall v. Commonwealth*, 140 Va. 541, 552-3, 125 S. E. 329, 333, and *Dellastatious v. Boyce*, 152 Va. 368, 383-4, 147 S. E. 267, 272.

"What is a reasonable search is not to be determined by any fixed formula. The Constitution does not define what are 'unreasonable' searches and, regrettably, in our discipline we have no ready litmus-paper test. The recurring questions of the reasonableness of searches must find resolution in the facts and circumstances of each case. * *." *United States v. Rabinowitz*, 339 U.S. 56, 63, 70 S. Ct. 430, 434, 94 L. ed. 653, 659.

"It must always be remembered that what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures." *Elkins v. United States*, 364 U. S. 206, 222, 80 S. Ct. 1437, 1446, 4 L. ed. 2d 1669, 1680.

In *United States v. Ramirez*, (2 Cir.), 279 F. 2d 712, 714, it is said that the classic statement of the law of probable cause relative to the issuance of search warrants is to be found in *Dumbra v. United States*, 268 U. S. 435, 441, 45 S. Ct. 546, 549, 69 L. ed 1032, 1036.[4] The affidavit in *Ramirez* was that the affiant had reason to believe that on described premises heroin was being concealed, based on the fact that two days before he was in an apartment in the premises and there saw quantities of a white powder that he believed to be narcotics. The court was unanimous in concluding that the search warrant was in all respects valid, saying, "We have surveyed the cases in the federal courts, and we find none wherein a search warrant was held invalid because of an affidavit similar to the one before us." 279 F. 2d at 715.

We hold that the affidavit in the present appeal alleged sufficient facts to constitute probable cause for the issuance of the search warrant and that the warrant issued thereon was a valid search

---

[4] "In determining what is probable cause, we are not called upon to determine whether the offense charged has in fact been committed. We are concerned only with the question whether the affiant had reasonable grounds at the time of his affidavit and the issuance of the warrant for the belief that the law was being violated on the premises to be searched; and if the apparent facts set out in the affidavit are such that a reasonably discreet and prudent man would be led to believe that there was a commission of the offense charged, there is probable cause justifying the issuance of a warrant."

warrant, and the search and seizure made upon its authority were in all respects lawful. It follows that the results of the search were admissible in evidence and the holding of the Supreme Court in *Mapp v. Ohio*, 367 U. S. 643, 655, 81 S. Ct. 1684, 1691, 6 L. ed. 2d 1081, 1090, that "all evidence obtained by searches and seizures in violation of the Constitution is, by that same authority, inadmissible in a state court," is not applicable to the facts in this case.

■ The evidence as introduced clearly supported the finding of the trial court that a lottery was in operation on October 21, 1957, and part of it was then being conducted on the searched premises by both Nannie V. Compton and Joseph A. Chase and that the 44 items listed on said Exhibit A were used in connection with the operation.

After procuring the search warrant, Leonard J. Burnett, of the Arlington county police, and other officers, proceeded to the premises to make the search. Mrs. Compton admitted them through a back door, after ascertaining that they had a warrant. Inside they found Chase in the den, or office, behind a desk engaged in a telephone conversation. Burnett showed his badge; Chase said, "Oh, my God," and then, "Sit down, Chief, and let's talk this thing over". Burnett inquired, "Where is the work?" meaning, he said, the numbers work. Chase replied, "It's right here," pointing to a suitcase on the floor, apparently the same suitcase which the officers had seen delivered to the house a short while before the search. Burnett opened it and found therein numerous bags of numbers slips and cash totaling $1,658.08, designated as item 43 on Exhibit A. Chase told the officers that if they had been five minutes later the contents of the suitcase would not have been there. Other officers participating in the search reported that they had found adding machines and a laundry bag full of numbers slips in the basement. Chase said he had a lady guest in the house who did not know about his business and requested the officers to be as quiet as possible. Burnett told him if he cooperated they would not have to tear up anything and Chase replied, "O.K., you've got me". Thereupon they opened cabinet and desk drawers and Chase opened a safe that was there. In a cabinet drawer they found numerous numbers slips and cash, totaling $3,889, identified as item 44 on Exhibit A.

Item 41 of Exhibit A, described as "One evidence bag # 3 containing $6,697.68 in cash and numbers slips and paraphernalia," was found in a cabinet drawer with the numbers slips in with the money. Included were four envelopes, which the officer identified as being

connected with the numbers business by pointing out thereon a designated code for the writer or runner and the amount of money that was turned in in each of these envelopes. Items 41, 42, 43 and 44 of Exhibit A designated the money that was seized and forfeited, amounting to $12,264.98. This and six adding machines comprise the principal value of the seized property. The remainder consisted of stationery and equipment of small value. There was evidence that all of these items were used in connection with the operation and conduct of the numbers game, which is a lottery. *Quidley* v. *Commonwealth*, 190 Va. 1029, 1038, 59 S. E. 2d 52, 56; *Hayden* v. *Commonwealth*, 203 Va. 398, 400, 124 S. E. 2d 13, 14.

Burnett, who had had extensive experience with such operations as an officer, testified that this establishment that was searched was "the last resort of the business. This is the bank. This is where the man that backs this operation is informed of what he has done and what he owes and what he made."

Photographs of the premises taken at the time of the raid showing outside doors and inside rooms with their equipment and contents, furnished strong support for such conclusion. The back door, through which the officers entered, was covered with a steel mesh similar to a grating and equipped with a double lock, and the basement windows were covered with newspapers. Every door on the inside was locked and could be opened only with a key. Chase told the officers that he had about 200 runners and that his operation was running from 4200 to 4500 plays per day. As stated, he and Mrs. Compton both confessed their guilt.

The claim of Tri-Pharmacy to the $6,697.68, item 41 of Exhibit A, is without merit. It was based on testimony of Nannie V. Compton that she was secretary and treasurer of the company, which had its place of business in the city of Washington and that since 1954, when the company was organized, it had been her practice to bring the company's money to her house every day, then deposit some of it and put the balance in the drawer of the file to keep, along with miscellaneous money of her own, the amount of which she did not know. Her explanation was that she kept it at home rather than in the bank "in case something happened or somebody got nasty and wanted to foreclose on it. They would not be able to seize it all". There was nothing to identify it as drug store money, she said. She and a daughter of Joseph A. Chase and Calvin E. Johnson were the company's stockholders. Johnson testified that he was president and manager and that "we gave Nannie V. Compton permission to take

out of the business receipts so much money—no specific amount—and she was to keep it in her home, or wherever she chose to keep it, until we accumulated a certain amount for certain plans, certain things we wanted to do". The company had no record of the amount. One of the reasons for the arrangement, he said, was to protect against lawsuits, but they had not had any lawsuits.

It is clear that the trial court was warranted in accepting the evidence for the Commonwealth that this money was used in the lottery operation. The version of these claimants was "implausible to the point of fantasy". See *Spagnuolo* v. *Bonnet, post.*

The trial court was clearly right in holding that the property described in items 1 through 44 of said Exhibit A was used in connection with the operation and conduct of a lottery and therefore forfeited to the Commonwealth.

## Record No. 5444

The appeal of the United States of America in this case challenges the further holding of the trial court that the forfeiture to the Commonwealth so declared takes precedence over the claim of the United States for its tax liens on the forfeited property.

This claim was based on two assessments described in the appellant's intervening complaint, the first made October 29, 1952, before the seizure, and the second made November 2, 1957, after the seizure but before the trial court's decree of May 23, 1961. In its brief the appellant says that the date and amount of the first assessment, as well as the taxpayers against whom it was made, were incorrectly stated in its complaint.

As to the first assessment, the appellant states, and its evidence is, that on October 29, 1952, the Commissioner of Internal Revenue made an assessment of wagering excise taxes, penalties and interest in the amount of $18,794.81 against Joseph A. Chase, Wayne B. King and Elden F. King. Demand for payment was made October 30, 1952. Notice of lien was filed November 6, 1952, with the clerk of the District Court of the District of Columbia and on October 23, 1957, with the clerk of Arlington county. Appellant's brief says "Various payments have reduced the amount outstanding on this lien to approximately $2,310". A witness for the appellant testified that the amount due as of the date he was testifying, June 9, 1960, was $5,711.21 plus accrued interest. An exhibit filed by him indicates that this amount was the balance on October 14, 1958.

Section 3670 of the Internal Revenue Code of 1939, 53 Stat. 448, 26 U.S.C.A., p. 944, in effect when this assessment was made, provided that if any person liable to pay any tax fails or refuses to pay after demand, the amount shall be a lien in favor of the United States on all property belonging to such person; and § 3671 of the same Code provided that the lien shall arise at the time the assessment list was received by the collector and continue until the liability is satisfied or becomes unenforceable from lapse of time. An exhibit indicated that the assessment was received by the collector on October 29, 1952. The position of the Commonwealth with respect to this lien is stated to be that the amount is indefinite and could not exceed the $2,310 stated in the appellant's brief to be the balance due, and that the United States had knowledge of the illegal use of the seized property and did not qualify as a lienor under § 18.1-341 of the Virginia Code, 1960 Replacement Vol.[5] (§ 18-302, Code 1950, as amended.)

There is no evidence that the United States had knowledge of the illegal use being made of the property and thus it appears that it had a properly perfected lien thereon at the time of the seizure, and under the terms of the State statute said lien has priority over the forfeiture to the extent of the balance due thereon, which must be ascertained and satisfied ahead of the rights of the Commonwealth.

█ As to the second assessment, the record shows that the Commissioner, on November 4, 1957, made a jeopardy assessment of excise taxes against Joseph A. Chase and Nannie V. Compton in the sum of $75,167.39, including interest, and notice of lien was filed on November 4, 1957, with the clerk of Arlington county.

Section 6322 of the Internal Revenue Code of 1954, 68A Stat. 779, 26 U.S.C.A., p. 449, then in effect, provided that the lien for taxes created by § 6321 of that Code should arise at the time the assessment was made. The Commonwealth's contention with respect

---

[5] § 18.1-341. Forfeiture of money, etc., drawn and property used in lottery; innocent owners or lienors.—All money and things of value drawn or proposed to be drawn by an inhabitant of this State and all money or things of value received by such person by reason of his being the owner or holder of a ticket or share of a ticket in any lottery or pretended lottery, contrary to this chapter, and all money, gambling paraphernalia, office equipment and all other personal property of any kind or character used in connection with the promotion, operation or conduct of any lottery or attempted lottery shall be forfeited to the Commonwealth and may be seized by an officer and held to await proceedings for condemnation; provided, that such forfeiture shall not extinguish the rights of any person without knowledge of the illegal use of such property who is the lawful owner or who has a lien on the same which has been perfected in the manner provided by law. The money or other personal property so forfeited shall be disposed of as provided by law.

to this assessment is that the forfeiture of the property to the Commonwealth under § 18.1-341, *supra*, occurred when the property was seized; that the owner was at that time divested of any right therein and that the forfeiture proceeding was required not to complete the forfeiture but to prove the illegal use for which the forfeiture was suffered.

We agree with the argument of the appellant that if the Commonwealth's claim was contingent or inchoate at the time the appellant's lien attached, *i.e.*, on November 4, 1957, then appellant's lien takes precedence. *United States* v. *Waddill Co.*, 323 U. S. 353, 65 S. Ct. 304, 89 L. ed. 294; *United States* v. *Security Trust & Savings Bank*, 340 U. S. 47, 71 S. Ct. 111, 95 L. ed. 53; *United States* v. *Lawler*, 201 Va. 686, 112 S. E. 2d 921.

Section 18.1-341, *supra*, as noted, provides that property used in connection with the operation of a lottery shall be forfeited to the Commonwealth and may be seized by an officer and held to await proceedings for condemnation. Chapter 10 of Title 29 of the 1950 Code, pursuant to which the information of February 10, 1958, was filed,[6] provided for the enforcement of forfeitures under § 18.1-341, *supra*. Sections 29-214, et seq., in said Chapter 10, provided for the filing of an information to enforce the forfeiture and for the procedure thereon, and § 29-224 provided that if the forfeiture be established, "the judgment shall be that the property be condemned as forfeited to the Commonwealth," sold and disposed of as provided in succeeding sections.

In *Hall* v. *Commonwealth*, *supra*, we held that whiskey and containers forfeited to the Commonwealth under the Virginia Prohibition Law, Acts 1918, ch. 388, were not the property of the defendant at the time they were seized by the officers, "the right to them having already vested in the Commonwealth". 138 Va. at 743, 121 S. E. at 159.

*United States* v. *Stowell*, 133 U. S. 1, 10 S. Ct. 244, 33 L. ed. 555, was an information proceeding for the forfeiture of property seized under Federal statutes relating to illegal distilling operations. The question was as to the priority of the government's right to property seized on the premises as against Stowell's prior mortgage and bills of sale. In giving precedence to the forfeiture the court said:

"By the settled doctrine of this court, whenever a statute enacts that upon the commission of a certain act specific property used in or

[6] Now Chapter 15 of Title 19, §§ 19.1-358, *et. seq.*, 1960 Replacement Vol.; Acts 1960, ch. 366.

connected with that act shall be forfeited, *the forfeiture takes effect immediately upon the commission of the act; the right to the property then vests in the United States, although their title is not perfected until judicial condemnation;* the forfeiture constitutes a statutory transfer of the right to the United States at the time the offense is committed, and the condemnation, when obtained, relates back to that time, and avoids all intermediate sales and alienations, even to purchasers in good faith." (Italics added.)

That principle was applied in *United States* v. *One 1957 Model Tudor Ford,* (1958), 167 F. Supp. 864, 866, to give priority to the government's right by forfeiture to an automobile over an existing lien created by State statute. The court said:

"The forfeiture granted by 26 U.S.C.A. §§ 3116 and 3321, takes place upon the commission of the forbidden act, and the statute operates to transfer the title at once to the government," citing Supreme Court cases.

*Spagnuolo* v. *Bonnet,* 16 N. J. 546, 109 A. 2d 623, involved the title to $50,000 in cash seized by police officers in a raid on the headquarters of a lottery operation. The money was seized by the sheriff on March 2, 1951, eighteen days prior to the effective date of the government's lien under a jeopardy assessment for income taxes. The government contended there, as here, that the county of Essex had nothing more than an inchoate lien or potential contingent property right in the money until the order of forfeiture dated May 5, 1954. The court held that the forfeiture took precedence over the government's lien and said:

"* * Where a forfeiture is absolute under the statute, as it is here, the judgment of condemnation or forfeiture when entered relates back to the commission of the wrongful act and takes date from the wrongful acts, not from the date of sentence or decree. * *." 16 N. J. at 559, 109 A. 2d at 630.

"The title and possession of the County of Essex was not that of a creditor or a judgment creditor but a title and possession acquired by an exercise of sovereign power, and therefore the case of *United States* v. *Security Trust & Savings Bank,* 340 U. S. 47, 71 S. Ct. 111, 95 L. Ed. 53 (1950), is not in point." 16 N. J. at 560-1, 109 A. 2d at 631.

We hold that the forfeiture declared by § 18.1-341 took effect at the time of the seizure, on October 21, 1957, and the right to the property seized then vested in the Commonwealth, subject by the terms of the statute to the lien of the United States under the assessment of

October 29, 1952, but prior to and taking precedence over the assessment of November 4, 1957.

We therefore reverse the decree of the trial court with respect to its adjudication that the forfeiture takes precedence over the lien of the United States under the assessment of October 29, 1952, but affirm said decree in all other respects and remand the case to the trial court with direction to ascertain the balance due the United States under said 1952 assessment, and to take further proceedings under the forfeiture and dispose of the property as required by law and as herein determined.

*Reversed in part, affirmed*
*in part and remanded.*