# Richmond

## John Patler v. Commonwealth of Virginia.

November 30, 1970.

Record No. 7103.

Present, All the Justices.

*Thomas J. Harrigan* (*Harrigan and Morris*, on brief), for plaintiff in error.

C. *Tabor Cronk, Assistant Attorney General* (*Andrew P. Miller, Attorney General; Vann H. Lefcoe, Assistant Attorney General,* on brief), for defendant in error.

HARMAN, J., delivered the opinion of the court.

This appeal is from a 20 year sentence pronounced by the trial court upon a jury verdict finding the defendant guilty of the first degree murder of George Lincoln Rockwell on August 25, 1967.

The testimony before the jury consumed approximately three weeks. The printed record is more than 1500 pages long.

We have examined each of the thirty-nine assignments of error filed by the defendant and find only two questions raised of sufficient substance to merit comment and discussion.

## I

*Did the court err in admitting in evidence certain shell casings and spent bullets discovered and seized on the farm of Sam Ervin in Highland County?*

Sam Ervin is the father of defendant's wife. The evidence shows that defendant, his wife and their children lived with Sam Ervin, his wife and children. Ervin, in his testimony, said that defendant was a part of his "family." Ervin owned a house at 2522 Lee Highway in Arlington and another house on his farm in Highland County. He testified that Patler, as a member of his family, had a key and free access to both houses and that the family spent approximately half of the time at each.

On September 16, 1967, during their investigation of Rockwell's murder, the police interviewed Lester James "Tom" Miller who was employed as a laborer on Ervin's farm. Miller told them that he had seen the defendant target shooting with a pistol in a field on the farm sometime in July.

After receiving this information the officers proceeded to the Ervin farm for the purpose of obtaining Ervin's consent to inspect the field for shell casings and spent bullets. They did not find Ervin or anyone else at the dwelling house.

The officers left the farm, obtained a search warrant, and then returned to the farm where they encountered Miller and again talked with him. As a result of the officers' questions, Miller pointed out the area where he had observed Patler shooting in July. The officers

went to the dwelling, knocked on the door and ascertained that no one was there. They then posted the search warrant and proceeded to the field pointed out by Miller where the shell casings and spent bullets were discovered and seized.

The spent bullets were removed from a tree which was located about 250 feet from the dwelling house in a field described by some of the witnesses as a pasture. The shell casings were discovered in the same field approximately the same distance from the house and were 25 feet to 75 feet away from the tree where the spent bullets were found. The house and outbuildings adjacent thereto are surrounded by a fence which was built during the spring or summer of 1967. The spent bullets and shell casings were approximately 200 feet outside of this fenced area.

A pretrial hearing was conducted on a motion by the defendant to suppress these shell casings and spent bullets.

At this hearing several photographs were presented showing the dwelling and the fenced area around the dwelling. Other photographs were introduced showing the field where the seized items were found and its proximity to the house and yard. It was established that the farm was not posted against trespassers. Evidence was introduced showing the location of the various outbuildings and the purposes for which they were used. The evidence discloses there is a dry creek bed or ditch and a small branch or creek between the yard fence and the place where the controverted items were found.

Patler presented evidence that the field was regularly mowed and was used occasionally as a picnic area for the family. There was evidence that the Patler and Ervin children played in the field "quite a bit" and had erected a "fort" of rough boards there during the summer of 1967.

The trial court held the search warrant to be invalid because of an insufficient affidavit, a ruling that is not challenged here. It ruled, however, that the defendant's motion to suppress should be denied as a search warrant was not required to conduct this search under the open field doctrine recognized by this court in *McClannan* v. *Chaplain*, 136 Va. 1, 116 S.E. 495 (1923). To reach this conclusion the court made a determination that the yard fence established the curtilage and that the field was outside the curtilage.

Patler argues that even if the field was outside the curtilage the items seized were the fruits of an illegal search warrant and a failure to

suppress them would be a violation of his rights under the Fourth Amendment to the United States Constitution.

■ This argument must fail for it is well established that " . . . the special protection afforded by the Fourth Amendment to the people in their 'persons, houses, papers and effects,' is not extended to the open fields. The distinction between the latter and the house is as old as the common law. 4 Bl. Comm. 223, 225, 226." *Hester* v. *United States*, 265 U.S. 57, 59, 44 S.Ct. 445, 446, 68 L.ed. 898, 900 (1924).

"Ever since this Supreme Court pronouncement in *Hester*, the 'open field' doctrine has been uniformly recognized and applied where, under the facts of a particular case, it was held that the search and seizure had occurred in an open field." *Wattenburg* v. *United States*, 388 F.2d 853, 856 (9th Cir. 1968).

■ The real issue, therefore, is raised by defendant's argument that the trial court erred in finding the field to be outside the curtilage. He contends that this finding is contrary to the evidence.

"The curtilage of a dwelling house is a space necessary and convenient, habitually used for family purposes and the carrying on of domestic employment; the yard, garden or field which is near to and used in connection with the dwelling." *Bare* v. *Commonwealth*, 122 Va. 783, 795, 94 S.E. 168, 172 (1917).

When we apply the holding in *Bare* to the facts of this case it is apparent that the latter argument must also fail.

The evidence discloses that the area around the dwelling and outbuildings habitually used and necessary and convenient for family purposes was enclosed by a substantial fence. When such a fence is erected it ordinarily defines the curtilage, particularly in a rural area. The evidence further shows that the field was used only four or five times during 1967 for family picnics. While the field was regularly mowed, this is what one would ordinarily expect to be done to a pasture field in which no livestock grazed.

The only other evidence of family use was that Patler's son, age 3, and Ervin's twin sons, age 10, played there "quite a bit" and built a "fort" there in the summer of 1967.

We hold this evidence insufficient to establish the necessity, convenience and habitual use for family purposes which would be required in order to extend the curtilage to include the field.

## II

*Was the evidence sufficient to support the jury's verdict?*

The evidence establishes that Rockwell, head of the nazi party in America, died on August 25, 1967, after being shot twice in the chest at approximately 11:58 a.m. by an assailant who fired the shots from the roof of a shopping center on Wilson Boulevard in Arlington County. Rockwell had just entered his parked car in the shopping center lot when the shots were fired. The shots penetrated the windshield of the car before striking Rockwell. After being fatally wounded Rockwell opened the right front door and got out of the car; he pointed to the roof of the shopping center and then collapsed and died near the right rear of the car.

The shopping center is bounded on the south by Wilson Boulevard, a busy thoroughfare running east and west, and on the east by Liberty Street. The north line of the shopping center abuts the rear yard of a block of houses which face on 9th Street. A person traveling north on Liberty Street from Wilson Boulevard would first cross 9th Street and would then descend a hill. Liberty Street terminates at a railroad which is four blocks from Wilson Boulevard. Bon Air Park, which lies north, east and south of the point where Liberty Street terminates, can be reached by crossing the railroad right of way.

Mrs. Thelma Burgess, whose back yard adjoined the rear of the shopping center, heard a shot and looked toward the shopping center. She observed a man run across the roof of the shopping center and leave the rear of the roof by stepping on a brick wall separating the shopping center from the houses facing on 9th Street. She then observed him leave the wall and run across the parking lot of the shopping center. She was unable to identify this man or to describe him.

Mrs. Alma Kirkpatrick, who was just starting her parked car in the shopping center lot, saw a man on the brick wall. This man left the wall and ran across the parking lot passing her car. He then ran behind her car forcing her to stop. The man stopped, looked in the direction of Rockwell's car and then ran back to the wall and crossed it. She said the man was wearing a "brownish" or "dark brown coat" and that he looked "something like what Mr. Patler looks like."

James Cummings and Thomas Blakeney, two barbers employed at the shopping center, heard the shots. They ran outside where they were told by a bystander that the assailant had fired the shots from the roof. The two barbers ran to the rear of the shopping center where Cummings observed a man run across the corner of 9th and Liberty Streets. While Blakeney went to a nearby house to call

the police, Cummings followed the man and observed him run down the hill on Liberty Street in the direction of Bon Air Park. Cummings testified that this man had on "dark clothing" and had "dark hair."

Rebecca Middleton and Mrs. Mary Ratchford, who were standing at the front door of the Ratchford residence across 9th Street from the shopping center, observed a man run from the direction of the shopping center, cross 9th Street and go down Liberty Street toward Bon Air Park. Rebecca described this man, whose face she did not see, as having dark hair. She said he was wearing a dark coat. Mrs. Ratchford said the man had black wavy hair and was wearing a black raincoat.

Mrs. Nancy Ellen Thoburn, who was walking on Liberty Street toward Wilson Boulevard, observed a man run across the intersection of 9th and Liberty Streets. She described him as being a young man of medium build with dark hair and a dark complexion. Her testimony was that he was wearing a hat, casual shoes and a loose fitting dark or dark gray outer coat. She observed that his pants legs were wet halfway to the knees and that he ran down Liberty Street toward Bon Air Park.

Glenn Frazier Hall, who lives at 934 North Liberty Street, parked his car in the driveway of his residence at a time he estimated to be four or five minutes after noon. As he alighted from his car he observed a man running down Liberty Street toward Bon Air Park. He identified the defendant as this man. Hall testified that Patler was wearing "a dark coat, which seemed to be a serge or a raincoat; he had on a gray cap of some sort." On cross-examination Hall testified that he had told the police on at least two occasions that he could not positively identify the man. He said, however, that he became positive that Patler was the man he had observed when he saw Patler's picture in a newspaper on the morning of August 27.

Other witnesses testified that they saw or heard a man run down Liberty Street in the direction of Bon Air Park but none of them could identify the man.

The police were notified of the shooting at 12:02 p.m. and they began an immediate investigation. This investigation disclosed that a man had been observed running from the shopping center down Liberty Street in the direction of Bon Air Park, which was approximately four blocks from the shopping center. A large number of

police officers were sent to the area surrounding the park to conduct an intensive search for the assailant.

Inspector R. S. Cole, one of the officers conducting this search, was driving his car west on Washington Boulevard at a point about one mile from the shopping center. At approximately 12:25 p.m. he saw a dark-haired man wearing dark trousers walking east on the north side of Washington Boulevard. Cole was driving an unmarked police car. He was wearing a police uniform and cap. The man Cole observed was wiping his face with a large turkish towel as the officer passed him. The officer turned his car onto a side street and went around the block for the purpose of intercepting this man. When the officer again reached Washington Boulevard he saw the same man at a bus stop at Washington Boulevard and Inglewood Street. When the officer reached a point near the bus stop, the man ran from the bus stop in a southerly direction between two houses. Inspector Cole drove his car around the block twice in an unsuccessful effort to find the man. At 12:28 p.m., as Cole was preparing to search a wooded area near the bus stop, he received a radio call from another policeman, Detective Ernest R. Davis, asking him to come to Washington Boulevard and Harrison Street, a point two blocks east from where he had last seen the man.

Upon Cole's arrival there he found Patler, whom he had known for about seven years, in the custody of Detective Davis and two other police officers.

At the time of defendant's arrest he had no identification on his person. He was sweating profusely. He was wearing dark trousers, a yellow or tan shirt, tennis shoes and had a bath towel draped around his neck. His tennis shoes were wet, his trousers were wet to above the knees and his shirt was wet, especially on the back.

On the afternoon of August 25 a reversible raincoat, black on one side and tan on the other, and a gray or bluish gray cap were found under a bush on a lawn near the point where Liberty Street terminates. The coat was identified as belonging to Patler by a man who formerly roomed with him. Another witness testified that he had seen Patler wear a similar coat on many occasions.

A Mauser pistol, identified by ballastics experts as the murder weapon, was recovered from a creek in Bon Air Park on August 26. This gun is unusual in appearance and is heavier than most hand guns. It has an overall length of 12 inches and it weighs about three pounds

when loaded. The place where the gun was found was about midway between the shopping center and the place where Patler was arrested.

Robert A. Lloyd, III, testified that he had purchased this gun bearing serial no. 9811 in March, 1962. His evidence in this regard was confirmed by the records of the gun dealer from whom it was purchased. Lloyd testified that he became acquainted with Patler in 1963 after Lloyd joined the nazi party. He testified that he loaned this pistol to John Patler in the fall of 1964. When he asked Patler to return the gun in 1965, defendant told him that the gun was either mislaid or stolen. Lloyd further testified that the gun was never returned to him by Patler.

Another nazi, Robert Lee Pace, testified that defendant was in possession of a Mauser "broomstick" pistol, the same type gun as the death weapon, in January or February of 1966.

A ballistics expert from the Federal Bureau of Investigation testified the shell casings and spent bullets seized on the Ervin farm were fired by the murder weapon.

On August 24, the day before Rockwell's death, almost 3½ inches of rain fell in Arlington County. This rain had terminated between midnight and 1:00 a.m. on August 25. The roof of the shopping center where Rockwell was shot had been giving difficulty for a prolonged period of time. The drainage system on the roof appears to have been defective and the tenants were complaining of water damage. At noon on August 25 from two to six inches of water were standing in various places on the roof.

Patler had been a nazi since 1960. Prior to April, 1967, he held the party rank of captain and was the editor of a party publication. A series of arguments and disagreements which became progressively more heated developed between defendant and Rockwell. As their relationship worsened, charges and counter charges were leveled by each against the other. On March 30, 1967, Rockwell, as head of the organization, relieved Patler of his duties as editor of the party publication. On April 4 Patler was summarily dismissed from the party at Rockwell's direction. In June Patler made a statement on three separate occasions to Christopher Vidnjevich, a party member, that "Rockwell is an evil genius and he must be stopped." Vidnjevich described defendant as "very bitter" about his dismissal from the party and quoted him as saying "We're going to stop him." At that time defendant was attempting to organize a group that he called "White Power Committee."

The testimony of other witnesses corroborates the strained relationship between Rockwell and Patler and the feeling between them that resulted from the arguments between them and defendant's dismissal from the organization.

Patler, who testified in his own defense, denied firing the fatal shots. He testified in detail as to his whereabouts on the day Rockwell was killed. He acknowledged that his relationship with Rockwell was strained. He said his differences with Rockwell were political and denied that he was angry with Rockwell or bitter toward him. He denied threatening Rockwell.

Defendant denied being in the vicinity of the shopping center for a week before the shooting. The Commonwealth's rebuttal evidence showed Patler was in the vicinity of the shopping center on either August 23 or 24.

Two witnesses testified that the Mauser pistol was in Lloyd's possession during the fall of 1965. Several witnesses, including Patler's wife and father-in-law, testified about defendant's movements on the day of the shooting. This alibi testimony placed him approximately three miles from the shopping center at or a few minutes before noon on August 25. Patler did not have a drivers license and he did not own or have access to a car.

Patler's explanation at the time of his arrest of his wet shoes and pants was that he had been walking through wet grass and had been striking shrubbery with his hands.

Certain scientific tests were performed on the shoes and clothing defendant was wearing when arrested. Tests conducted of Patler's clothing for residuals commonly associated with the recent firing of a weapon were negative. Negative results were obtained in the comparison of microscopic residue from Patler's clothing against soil samples from the escape route and paint samples from the roof of the shopping center. Footprints found on the roof of the shopping center did not match Patler's shoes but it was shown that two workmen had been on the roof earlier the same day.

Tar was discovered on the soles of the shoes worn by defendant at the time of his arrest. This tar was compared to tar samples from the roof of the shopping center. The expert testimony established that neither tar sample contained any impurities and an opinion was rendered that it was not possible to say that the tar on Patler's shoes came from the roof.

Defendant argues that the evidence outlined above is wholly circumstantial and that it is insufficient to support his conviction.

█ It is fundamental that when the sufficiency of the evidence is challenged after conviction it is our duty to view it in the light most favorable to the Commonwealth, granting all reasonable inferences fairly deducible therefrom. The judgment should be affirmed unless it appears from the evidence that such judgment is plainly wrong or without evidence to support it. Code § 8-491; *Cameron* v. *Commonwealth*, 211 Va. 108, 175 S.E.2d 275 (1970); *Corbett* v. *Commonwealth*, 210 Va. 304, 171 S.E.2d 251 (1969); *Jones* v. *Commonwealth*, 210 Va. 299, 170 S.E.2d 779 (1969).

█ Where the proof relied upon by the Commonwealth is largely circumstantial, as it is here, then to establish guilt beyond a reasonable doubt all necessary circumstances proved must be consistent with guilt and inconsistent with innocence. They must overcome the presumption of innocence and exclude all reasonable conclusions inconsistent with that of guilt. To accomplish that, the chain of necessary circumstances must be unbroken and the evidence as a whole must satisfy the guarded judgment that both the corpus delicti and the criminal agency of the accused have been proved to the exclusion of any other rational hypothesis and to a moral certainty. Yet what inferences are to be drawn from proved facts is within the province of the jury and not the court so long as the inferences are reasonable and justified. *Boykins* v. *Commonwealth*, 210 Va. 309, 312, 170 S.E.2d 771, 773 (1969); *Braxton* v. *Commonwealth*, 209 Va. 750, 752, 167 S.E.2d 120, 122 (1969); *LaPrade* v. *Commonwealth*, 191 Va. 410, 418, 61 S.E.2d 313, 316 (1950).

The burden is upon the Commonwealth to prove beyond a reasonable doubt that motive, time, place, means and conduct concur in pointing out the accused as the perpetrator of the crime. *Boykins* v. *Commonwealth, supra; Abdell* v. *Commonwealth*, 173 Va. 458, 470, 2 S.E.2d 293, 298 (1939); *Dean* v. *Commonwealth*, 73 Va. (32 Gratt.) 912, 926 (1897).

We find the evidence to be sufficient to support the conviction. Defendant's motive and his threats against Rockwell were shown by the direct evidence of Vidnjevich.

Patler was recognized and his conduct was related by Hall who saw and identified him as he fled past Hall's house less than two blocks from the scene of the killing. The other witnesses saw and described a man fleeing from the scene and established his route of flight.

Patler's possession of the murder weapon in 1964 and 1966 was established by the evidence of Lloyd and Pace. That he continued to possess this gun was shown by the evidence seized on the farm in Highland County. The gun was abandoned and concealed between where defendant was seen and identified by Hall and the place of his arrest.

The wet condition of Patler's shoes and trousers was consistent with his presence on the roof where water was standing and the evidence of Mrs. Thoburn who saw him near the rear of the shopping center.

The coat found near the park was definitely identified as belonging to Patler. It was found at a place on the escape route and at a place Patler denied having been.

Defendant's flight from Inspector Cole on Washington Boulevard and his profuse sweating at the time he was apprehended are circumstances which the jury was entitled to consider.

From these facts and the unbroken chain of circumstances disclosed by the evidence the jury had a right to conclude that the Commonwealth had met its burden of proving beyond a reasonable doubt that motive, time, place, means and conduct had concurred in pointing to the defendant as the murderer. We, likewise, find this evidence consistent with the defendant's guilt and inconsistent with his innocence.

For these reasons the judgment of the trial court is affirmed.

*Affirmed.*