## Richmond

GREGORY BLANTON LUGAR v. COMMONWEALTH OF VIRGINIA.

March 4, 1974.

Record No. 8262.

Present, All the Justices.

*Michael Morchower*, for plaintiff in error.

*James E. Kulp, Assistant Attorney General (Andrew P. Miller,* on brief), for defendant in error.

COCHRAN, J., delivered the opinion of the court.

The trial court, sitting without a jury, convicted Gregory Blanton Lugar of the statutory burglary of two Richmond drugstores, Sunset Hills Pharmacy and Cavedo's Drug Store, under Code § 18.1-89 (Cum. Supp. 1973). The court sentenced Lugar to serve eight years in the State penitentiary on the first count, but suspended imposition of sentence on the second count during good behavior. The dispositive question in this appeal is whether certain evidence of the

Commonwealth, admitted over Lugar's objection, was seized in violation of his Fourth Amendment rights.

About 2:00 a.m. on March 14, 1972, Richmond police officers, searching for a fugitive named Hodges, discovered that an automobile, which Hodges had been operating when he had earlier eluded Henrico County police, was blocking a driveway behind an apartment building at 1104 Floyd Avenue in Richmond. The officers ascertained that the vehicle was registered in the name of Michael Carter and learned from a passerby that the occupants of the car had gone to Apartment 3, 1102 Floyd Avenue, which Lugar later gave as his residence.

Richmond police, accompanied by Henrico County officers, proceeded to that apartment and knocked on the door. During the period of eight to fifteen minutes that passed before Carter opened the door, the officers heard footsteps and the rustle of paper inside the apartment. When the officers asked for Hodges, Carter informed them that Hodges was not there, but apparently admitted the officers to permit them to determine for themselves whether the fugitive was in the apartment.

Upon entering the apartment, the officers observed in plain view, on the floor of one of the rooms, two red capsules, which they recognized as seconal, a controlled drug, and a container marked "Seconal", which they recognized as a type of container used by drug wholesalers. The officers arrested the three occupants of the apartment, one of whom appeared to be under the influence of drugs, and requested permission to make a further search of the premises, which request was refused.

Although the officers had no search warrant, they searched the apartment, which consisted of a bedroom-kitchen, another bedroom, a bath, a closet and a hall, for at least an hour and a half. They never found Hodges, but they found quantities of drugs "all over" the apartment. Some of the items discovered and seized were in open view, but some of the drugs were found in or behind bags and containers. A stamp machine was found in the oven, but the record does not show whether the oven was open or, if closed, whether it was opened before the stamp machine was seen.

The officers seized over 7,000 pills and capsules, the stamp machine, labels from Sunset Hills Pharmacy, a Mickey Mouse wrist watch box, a watch display case, two Bank of Virginia money bags, and numerous drug boxes and bottles with code symbols identifying them as having come from either Cavedo's Drug Store or Sunset

Hills Pharmacy. They also observed several letters addressed to Lugar, who was not present in the apartment, but who was apprehended as he fled from the apartment building. After Lugar's arrest, it was discovered that he was wearing a Mickey Mouse wrist watch. Some hours later, police officers returned with a search warrant to the apartment and found and seized additional bottles of drugs.

In overruling Lugar's motion to suppress the evidence seized by the officers without a search warrant, the trial court found that "the search was reasonable under all the circumstances", which included Carter's consent to the officers' entry and the officers' discovery of controlled drugs in plain view. Except for the Mickey Mouse watch box and loose pills and capsules, all the items seized in the apartment, including the Bank of Virginia money bags, were positively identified by witnesses as having been taken in one or the other of the burglaries of the two drugstores. The Mickey Mouse watch found on Lugar and the watch box seized in the apartment had no identifying symbols but were similar to a watch and watch box taken from Sunset Hills Pharmacy in the burglary. The watch display case, however, bearing a Sunset Hills Pharmacy label, had been used by the drugstore to display the Mickey Mouse electric wrist watch which had been stolen.

Warrantless searches of private property without proper consent are *per se* unreasonable under the Fourth Amendment, subject only to a few specifically established and well-defined exceptions. *Cady v. Dombrowski*, 413 U.S. 433, 439 (1973); *Katz v. United States*, 389 U.S. 347, 357 (1967). *See Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971). Only where incident to a lawful arrest or in exceptional circumstances may a warrantless search and seizure of personal effects be made, and the burden is on the prosecution to show a justification for such seizure. *Morris v. Commonwealth*, 208 Va. 331, 334, 157 S.E. 2d 191, 194 (1967). *See* Code § 19.1-88 (1960 Repl. Vol.). Under the exclusionary rule made applicable to the states by *Mapp v. Ohio*, 367 U.S. 643 (1961), evidence unlawfully seized in violation of the Fourth Amendment may not be used against an accused. *Hawley v. Commonwealth*, 206 Va. 479, 481, 144 S.E.2d 314, 316 (1965), *cert. denied*, 383 U.S. 910 (1966). *See also Ker v. California*, 374 U.S. 23 (1963).

A general search of the apartment was not justified by consent. Carter consented for the officers to enter the apartment and to search for the fugitive, Hodges. This gave the officers the right to make a reasonable search of places in the apartment where a fugitive might

hide. It did not give them the privilege of searching in bank bags, trash containers or other spaces which obviously could not hide a man.

The Attorney General contends that the warrantless seizure of evidence was lawful because many of the items taken were in plain view. The "plain view" doctrine has been applied where, as here, police officers, with prior justification for being on the premises, are not searching for evidence against the accused but inadvertently come across incriminating evidence. *Coolidge* v. *New Hampshire, supra,* 403 U.S. at 466; *Frazier* v. *Cupp,* 394 U.S. 731 (1969); *Harris* v. *United States,* 390 U.S. 234 (1968); *Ker* v. *California, supra,* 374 U.S. at 43. But this rule applies only where there was no search for the object seized. *Carter* v. *Commonwealth,* 209 Va. 317, 320, 163 S.E.2d 589, 592 (1968), *cert. denied,* 394 U.S. 991 (1969); *Chevrolet Truck* v. *Commonwealth,* 208 Va. 506, 509, 158 S.E.2d 755, 758, *cert. denied,* 391 U.S. 964 (1968). There was no finding by the trial court, however, as to what items were lawfully seized under the "plain view" rule.

In *Coolidge* v. *New Hampshire, supra,* 403 U.S. at 469, Mr. Justice Stewart, writing for a plurality of the Supreme Court, stated that plain view seizures are lawful only when discovery of the objects seized is "inadvertent". He explained this requirement:

> "The rationale of the [plain view] exception to the warrant requirement . . . is that a plain-view seizure will not turn an initially valid (and therefore limited) search into a 'general' one, while the inconvenience of procuring a warrant to cover an inadvertent discovery is great. But where the discovery is anticipated, where the police know in advance the location of the evidence and intend to seize it, the situation is altogether different. The requirement of a warrant to seize imposes no inconvenience whatever, or at least none which is constitutionally cognizable in a legal system that regards warrantless seizures as *'per se* unreasonable' in the absence of 'exigent circumstances.' " 403 U.S. 469-471.

Assuming, without deciding, that the plurality opinion has precedential significance, we conclude that in this case the officers were entitled to seize whatever evidence they discovered in plain view while acting within the scope of their privilege to look for Hodges in the apartment. The officers' discovery of contraband was inadvertent because they did not enter the apartment with the ulterior

motive of searching for controlled drugs. Thus, the officers clearly had the right to seize the seconal capsules and the container marked "Seconal". After finding the seconal, the officers could not make a *general* warrantless search of the apartment for additional drugs. To the extent that they did so, their search was illegal and evidence seized as a result was inadmissible in Lugar's trial. However, the officers were not required to discontinue their search for Hodges when they inadvertently discovered the seconal and arrested the three occupants of the apartment. They could lawfully seize any evidence that they could observe while carrying out the search for which consent had been given. Thus, any contraband that was visible to the officers as they looked for Hodges could be seized.

Discovery of the seconal gave the officers probable cause to arrest the occupants of the apartment for possession of controlled drugs. As incident to the arrests, the officers could make a search, limited by *Chimel* v. *California*, 395 U.S. 752, 763 (1969), to each occupant's person and to the area within his reach where he might obtain a weapon or destroy evidence. There was no finding, however, as to what, if any, items of evidence were lawfully seized by the officers incident to the arrests, within the limitations imposed by *Chimel*.

From the record it is clear that the extensive and exhaustive warrantless search conducted by the officers exceeded the scope of their authority. As there were at least five officers in the apartment, there were no exigent circumstances to justify the failure to obtain a search warrant for drugs before ransacking the premises. There was no danger that evidence might be destroyed or that officers might be overpowered by the suspects if one or more officers had been dispatched for a search warrant. Consequently, it may well be that much of the evidence seized was inadmissible against Lugar.

It cannot be said that any error in admitting such evidence was harmless as a matter of law. The watch box, the money bags, the pharmacy labels and the boxes and bottles bearing drugstore code symbols provided the evidence that the property seized had been taken from Sunset Hills Pharmacy and Cavedo's Drug Store. If all these were inadmissible, Lugar could not have been convicted of the burglaries.

Lugar's conviction must be reversed and the case remanded for a new trial after the trial court has determined what evidence is admissible against Lugar. In making this determination the trial court shall hold to be admissible evidence seized by the officers that (1) was discovered in plain view while searching for Hodges, (2) was

found in a search incident to arrest of the occupants of the apartment and the areas within their reach, or (3) was seized pursuant to the search warrant that was subsequently issued and executed.

*Reversed and remanded.*

POFF, J., concurring.

I concur in the result.

Inasmuch as this is our first occasion to consider a warrantless search and seizure within a private dwelling since the Supreme Court's decisions in *Coolidge* v. *New Hampshire,* 403 U.S. 443 (1971) and *Chimel* v. *California,* 395 U.S. 752 (1969), explicating Fourth Amendment standards, I believe a broader discussion of those standards and their application to the facts in this case is warranted. Under these standards evidence was erroneously admitted in the trial below and such error was not shown to be harmless.

## I. *APPLICABILITY OF FEDERAL CONSTITUTIONAL STANDARDS TO SUPPRESSION OF EVIDENCE DETERMINATIONS BY STATE COURTS*

Reversing a state conviction based on evidence seized in defendant's house during a warrantless search by state police, the Supreme Court in *Mapp* v. *Ohio,* 367 U.S. 643 (1961) held that the evidence was obtained in violation of the Fourth Amendment[1] and, therefore, was inadmissible.

> "Since the Fourth Amendment's right of privacy has been declared enforceable against the States through the Due Process Clause of the Fourteenth, it is enforceable against them by the same sanction of exclusion as is used against the Federal Government." *Mapp* v. *Ohio,* 367 U.S. at 655.

The Supreme Court called for federal and state recognition of their "now mutual obligation to respect the same fundamental criteria in their approaches". *Mapp* v. *Ohio,* 367 U.S. at 658.

---

[1] "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV.

At the time *Mapp* made the exclusionary rule constitutionally mandatory upon the states, the "fundamental criteria" for assessing the constitutional validity of a warrantless search of a dwelling were those pronounced in *Harris* v. *United States*, 331 U.S. 145 (1947), and *United States* v. *Rabinowitz*, 339 U.S. 56 (1950).

In *Harris* federal officers, acting under arrest warrants for mail fraud and transportation of forged checks in interstate commerce, arrested Harris in his apartment. Without benefit of a search warrant, they conducted a five hour search of his four-room apartment and found illegal draft cards inside a sealed envelope taken from a closed bureau drawer. The Supreme Court held that the warrantless search was valid as a reasonable search incident to the arrest and that as contraband the illegal draft cards were lawfully seized and admissible as evidence.

In *Rabinowitz* the Supreme Court upheld the warrantless search of defendant's entire office as a lawful search incident to arrest and said that "[t]he relevant test is not whether it is reasonable to procure a search warrant, but whether the search was reasonable." *United States* v. *Rabinowitz*, 339 U.S. at 66.

On the "fundamental criteria" laid down in these two cases we have frequently relied.[2] Following our lead, Virginia trial courts and law enforcement officers have been guided by the *Rabinowitz* rule. But that rule is no longer the constitutional yardstick for measuring the constitutional validity of the search of a dwelling incident to arrest. The Supreme Court reconsidered and revised the "fundamental criteria". In *Chimel* v. *California*, 395 U.S. 752 (1969), state police officers conducted a 45-minute search of defendant's three-bedroom house incident to his arrest. The search uncovered "fruits" of the burglary for which Chimel had been arrested. Chimel's conviction was reversed under newly-articulated Fourth Amendment standards:

"When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect

---

[2] *Kirkpatrick* v. *Commonwealth*, 211 Va. 269, 287, 176 S.E.2d 802, 809 (1970); *Kirby* v. *Commonwealth*, 209 Va. 806, 808, 167 S.E.2d 411, 413 (1969); *Carter* v. *Commonwealth*, 209 Va. 317, 320, 163 S.E.2d 589, 592 (1968); *One 1963 Chevrolet Pickup Truck* v. *Commonwealth*, 208 Va. 506, 508, 158 S.E.2d 755, 758 (1968); *Jordan* v. *Commonwealth*, 207 Va. 591, 596, 151 S.E.2d 390, 394 (1966); *Rees* v. *Commonwealth*, 203 Va. 850, 864, 127 S.E.2d 406, 416 (1962); *Tri-Pharmacy, Inc.* v. *United States*, 203 Va. 723, 729, 127 S.E.2d 89, 93 (1962).

his escape. . . . In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule." *Chimel* v. *California*, 395 U.S. at 762-63.

*Chimel* expressly overruled *Rabinowitz* and *Harris* and fixed the outer constitutional boundaries of a warrantless search incident to arrest.

Any doubt that the *Rabinowitz* rule lingered on was resolved by the recent decisions in *Coolidge* v. *New Hampshire*, 403 U.S. 443 (1971), and *United States* v. *United States District Court*, 407 U.S. 297 (1972).

In *Coolidge* a majority reaffirmed *Chimel's* disavowal of the far-ranging searches authorized under *Harris* and *Rabinowitz* and stated the principle that:

"[A] search or seizure carried out on a suspect's premises without a warrant is *per se* unreasonable,[3] unless the police can show that it falls within one of a carefully defined set of exceptions based on the presence of 'exigent circumstances.' "[4] *Coolidge* v. *New Hampshire*, 403 U.S. at 474-75. (Part II D of Mr. Justice Stewart's four-Justice plurality opinion expressly joined by Mr. Justice Harlan).

In *United States v. United States District Court*, 407 U.S. at 315 n.16, Mr. Justice Powell, speaking for six Justices without dissent, re-addressed the *Rabinowitz* test and quoted with favor the *Chimel* conclusion that it was " 'founded on little more than a subjective view regarding the acceptability of certain sorts of police conduct, and not on considerations relevant to Fourth Amendment interests. Under such an unconfined analysis, Fourth Amendment protection in this area would approach the evaporation point.' "

## II. *MAKING THE CONSTITUTIONAL ADJUDICATION OF THE ADMISSIBILITY OF CHALLENGED EVIDENCE*

Before considering the record below in light of the *Chimel* and *Coolidge* standards we must resolve two threshold questions, viz.,

---

[3] *E.g., Schneckloth* v. *Bustamonte*, 412 U.S. 218, 219 (1973); *Katz* v. *United States*, 389 U.S. 347, 357 (1967).

[4] *United States* v. *Jeffers*, 342 U.S. 48, 51 (1951); *McDonald* v. *United States*, 335 U.S. 451, 456 (1948).

(1) in making the constitutional adjudication of admissibility, what is the measure of the burden of proof, and (2) in evaluating the findings of admissibility of the trial court, what standards should this court apply?

*Coolidge* reaffirmed the constitutional principle that when the defendant in his motion to suppress makes a prima facie showing that the evidence at issue was seized during a warrantless search, the presumption is that the search was unreasonable; that presumption shifts the burden of proof to the prosecution to show that the search and seizure were justified by consent or "exigent circumstances". The Supreme Court has never ruled directly on the measure of that burden, but in *Lego* v. *Twomey*, 404 U.S. 477, 488-89 (1972) (4-3 decision), the majority expressed a preference that admissibility of evidence be determined by a "preponderance of the evidence". I believe we should adopt that standard.

The second threshold question is equally important. Evaluation of the trial court's findings of admissibility does not give rise to the same issues posed by evaluation of the sufficiency of admissible evidence to support a conviction.

The evaluation of admissibility is a two-step process involving a factual determination *and* a constitutional adjudication. In making findings of fact, the trial court weighs the evidence of opposing parties, assesses the credibility of witnesses, and resolves any conflict in favor of one of the parties. To such findings of fact, we pay traditional deference.

But, here, the trial court made no specific findings of fact relative to the multiple items of challenged evidence. All of the testimony at the suppression hearing was given by police officers who participated in the arrests, searches, and seizures and who, we must presume, wanted the prosecution to sustain its burden of proving that their own conduct was constitutional. These officers testified concerning more than 7,000 items seized, much of which was admitted into evidence and none of which was suppressed. In the total absence of specific admissibility findings of facts, we cannot say, on this record, that the testimony is sufficient to support a general finding that all of the items were validly seized.

In the second step, the trial court's constitutional adjudication of admissibility necessarily involves interpretation and application of the highest law. We are not bound by trial court rulings of law. Reviewing those rulings we must make our own constitutional adjudication, based on examination of the entire record, as the Supreme

Court does when it reviews admissibility determinations by state courts.

> "While this Court does not sit as in *nisi prius* to appraise contradictory factual questions, it will, where necessary to the determination of constitutional rights, make an independent examination of the facts, the findings, and the record so that it can determine for itself whether in the decision as to reasonableness the fundamental—*i.e.*, constitutional—criteria established by this Court have been respected. . . .
>
> "Applying this federal constitutional standard we proceed to examine the entire record including the findings of [the state] courts to determine whether the evidence seized from petitioners was constitutionally admissible under the circumstances of this case." *Ker v. California*, 374 U.S. 23, 34 (1963).

## III. *EVIDENCE IN THE RECORD RELEVANT TO THE DETERMINATION OF ADMISSIBILITY*

At the risk of repeating what my brothers have said, I will attempt to assemble from the entire record a summary of the evidence relevant to a constitutional determination of admissibility of the challenged evidence. Following the new hearing on the motion to suppress, the trial court should make specific findings of fact relative to specific items of evidence and, applying constitutional standards, make specific adjudications of admissibility.

On the morning of March 14, 1972 shortly after midnight, Henrico County Patrolman Keenan stopped a small sportscar for a minor traffic violation. The driver was Ernest Frederick Hodges and the two passengers were Lugar and a man who identified himself as Matthew Wayne Baughan. Keenan ran a check on the three men and learned that Hodges was wanted for burglary of a store in Salem. With Keenan's permission, Lugar departed on foot. Hodges fled and Keenan pursued him. Losing him in the chase, Keenan returned to find that "Baughan" had left in the car.

At 2:00 a.m., Richmond police officer Combs and Henrico County police officer Justice located the car blocking a driveway behind an apartment building at 1104 Floyd Avenue in Richmond. Patrolman Keenan was called to the scene, to identify the car, registered to Michael Carter, as the one he had stopped earlier. By 3:00 a.m., the car had been towed away and reinforcements from the Richmond

and Henrico County police departments had arrived. Informed by a passerby that the occupants of the car had gone to apartment 3 located upstairs in the building at 1102 Floyd Avenue, Officer Hill and sergeants Davis and Schesventer stationed themselves at the front and rear of the building under instructions to watch for the fugitive Hodges dressed in a brown coat. Accompanied by Keenan, Justice, and two other officers, Combs proceeded to apartment 3 and knocked on the door. During the eight to fifteen minute wait which ensued, the officers heard "footsteps going across the floor inside the apartment" and "the sound of paper rubbing together".

The door was opened by Michael Carter. Combs informed him that his car had been towed away and "asked . . . if we could come in". Carter replied, "come in". Then or shortly thereafter Carter was told that the officers were looking for Hodges. Hodges was not present.

The apartment consisted of two 12′ x 12′ rooms separated by a hallway. The front room was a bedroom and the back a combination bedroom-kitchen. Lying on the bed in the front room was a man who identified himself as Dennis Newcomb. Keenan recognized him as "Baughan", one of the occupants of the car he had stopped earlier. Accompanied by Carter and another occupant of the apartment, "Nick" Zacharias, the five officers proceeded through the hall to the back room. There, on the floor near some trash bags Combs and Justice saw two red capsules which they recognized as "seconal", a controlled drug, and a "milk colored container" marked "Seconal". On the container top was the word "Lilly". Combs was familiar with such containers as the type used by drug wholesalers rather than the type used by drug retailers for prescription sales.

Within 15 minutes after entry, Carter and Zacharias were returned to the front bedroom where they and Newcomb, who appeared to be under the influence of drugs, were placed in Keenan's custody. Combs testified that "[i]n my mind they were under arrest." Shortly thereafter, Combs formally advised them that they were under arrest for possession of controlled drugs. Combs testified that the delay in announcing the arrest was caused by "several other activities that had to be immediately controlled" and that "several things . . . had to be taken into account just for our own safety." He asked but never received permission to search the apartment. Newcomb asked if they had a search warrant. Combs testified that "we didn't need one . . . he had been placed under arrest . . ."

Keenan, who held the three suspects in custody in the front bedroom for an hour and a half, testified that during that period the other officers "were searching the apartment." He said that he saw no drugs or other items of evidence until after they had been found by the other officers in the back room.

One of these officers who remained in the apartment for two and a half hours testified when asked about capsules on the floor that "in the kitchen-bedroom combination—it wasn't a great many tablets, it was about, I'd say, from five to seven, five to ten possibly." He said further that "[a]fter looking in more detail . . . there were drugs found all over the apartment", that "it was like an Easter egg hunt", that "there was a large amount of drugs found in a waste paper basket", that "one of the Henrico officers actually opened the basket", that one of the officers found a stamp machine inside the oven, and that one of the officers went through a big pile of trash.

Another officer testified that there were five or more trash bags in the kitchen area and "I saw the trash being emptied on the floor on newspapers . . ."

The Commonwealth's Attorney stipulated that some of the trash had to be moved "before some items could be seen."

Hill and Schesventer, two of the officers stationed outside, entered the apartment for brief periods. Schesventer entered once but only to tell Combs he was leaving. Hill, who saw possibly six officers there, testified that "There wasn't any use in me staying, they had the situation under control . . ."

In response to a call from Combs, Richmond detective Bennett arrived about 4:00 a.m. At that time, Bennett was aware that Sunset Hills Pharmacy had been burglarized of drugs and other items but did not learn until later about the Cavedo Drug Store burglary. The record indicates that one of the other five officers had prior knowledge of the Sunset Hills Pharmacy burglary. The record does not indicate that any of the officers were aware of the burglary of Cavedo's Drug Store.

Bennett collected the contraband and other evidence found earlier by the other officers, much of which had been left in its original location. As he seized the evidence, Bennett made a list of the items and noted the location in which each was found. This list does not appear in the record. Bennett testified that some of the drugs were discovered inside a bank deposit bag; that other items, including a Mickey Mouse electric watch box, were found in a disposable diaper box on the kitchen counter; that an old wrist watch "was

found in the pile of trash"; and that he noticed, but at this point did not seize, a "letter" and a shoe box containing other letters on the mantle over the kitchen stove.

About 4:30 a.m. as Bennett was returning to his car to get his evidence kit, two of the officers stationed at the rear of the building saw a man in a brown coat walking up the street. When they approached him, the man fled into the building with the officers in close pursuit. Dashing out the front door, the man collided with Bennett, knocking both to the ground. After a scuffle, Bennett arrested the man, who identified himself as "Gregory Woodson" but was later identified as Lugar, for disorderly conduct and had him and the three suspects arrested in the apartment taken to Richmond Police Headquarters.[5]

Bennett then returned to the apartment to finish collecting evidence, a task that required another hour. He "looked . . . at a number of other things in the apartment." He read and seized what he had earlier thought was a "letter" lying on the mantle. It was instead an "order of release and conditions of parole to Gregory Blanton Lugar". He also took the letters out of the shoe box on the mantle and saw that they were addressed to Lugar at apartment 3. Although apparently he did not seize these letters, he testified concerning the address on the envelopes.

On the afternoon of the same day, Bennett obtained a search warrant, returned to the apartment and recovered two more drug bottles containing a total of 15 pills.

Bennett testified that the total inventory of items seized in the apartment included 7000 pills and capsules, numerous drug containers, a postage stamp machine, a wrist watch, a green Bank of Virginia zipper deposit bag, a white Bank of Virginia drawstring bag, a Mickey Mouse electric watch box, and labels from Sunset Hills Pharmacy. Also introduced was an apparently new Mickey Mouse electric wrist watch seized by Bennett from Lugar's wrist. A similar watch had been stolen in the Sunset Hills Pharmacy burglary.

## IV. *THE TRIAL COURT'S DETERMINATION OF ADMISSIBILITY*

As noted in Part II *supra*, the trial court made no specific findings of fact relative to admissibility of the multiple items of challenged

---

[5] Lugar was charged with the burglary of Sunset Hills Pharmacy at 6:00 a.m. and during interrogation gave the apartment as his address. Several days later he was charged with the burglary of Cavedo's Drug Store.

evidence and with respect to its constitutional adjudication excluded none of the challenged items.

At the suppression hearing, the Commonwealth argued that most of the items were in "plain view" and that "[a] search is only illegal if it's unreasonable", and the trial court ruled "without hearing the evidence, the motion is denied, exception noted, the court feeling as to the search . . . clearly certain of the drugs were in plain view . . ."

At trial, the Commonwealth argued that the search was lawful under *Chimel* as a search incident to a lawful arrest and reasserted "plain view" as justification for the seizure of some of the items. Relying expressly on Lugar's parole order and the letter containing Lugar's name and address, both of which he characterized as "plain view" discoveries, and upon the Mickey Mouse electric watch box, the trial court found Lugar guilty of both burglaries. In summary the trial court said that "the officers had a lawful right to be in the apartment, and considering the items in plain view, the other matters brought to their attention, . . . the court feels that the search was reasonable under all the circumstances."

On appeal, the Commonwealth argues that much of the evidence seized was found in "plain view"; that "exigent circumstances" justified an expanded search; and that the evidence seized illegally, if any, was merely cumulative and therefore its admission into evidence constituted harmless error.

## V. *"PLAIN VIEW" SEIZURE OF EVIDENCE*

We assume that a search for Hodges marked the limit of consent to search the apartment.[6] But, when Combs, after the inordinate delay in answering the door and the noises heard during the delay, saw on the floor what he recognized as controlled drugs and a container customarily used for wholesale rather than retail commerce, he had knowledge of facts and circumstances which warranted the belief that the occupants of the apartment had committed the offense of possession of controlled drugs. *Howard* v. *Commonwealth*, 210 Va. 674, 678, 173 S.E.2d 829, 833 (1970). This discovery also gave Combs "probable cause" to search the apartment. *See Jones* v. *United States*, 362 U.S. 257, 271 (1960).

Having decided that the officers had probable cause to *search* the *apartment*, we should consider next their authority to *seize* the *evidence* visually observed therein.

---

[6] The evidence is uncontradicted that after the arrests, unchallenged at trial, consent to search was never granted.

The Commonwealth's expansive perspective of the "plain view" seizure doctrine renders it co-extensive with ocular experience. The constitutional limits of that doctrine are more narrowly drawn. As Mr. Justice Stewart recognized:

> "[I]n the vast majority of cases, *any* evidence seized by the police will be in plain view, at least at the moment of seizure. The problem with the 'plain view' doctrine has been to identify the circumstances in which plain view has legal significance rather than being simply the normal concomitant of any search, legal or illegal." *Coolidge* v. *New Hampshire*, 403 U.S. 443, 465 (1971).

The Fourth Amendment affords protection against both unreasonable *searches* and unreasonable *seizures*. Whether a seizure is unreasonable is a question constitutionally distinct from whether a search is unreasonable, and this distinction is critical to a correct analysis of a factual situation involving both a warrantless search and seizure.[7] Fundamental to the "plain view" doctrine is the absence of a search for the object seized.[8] The doctrine is relevant only to the constitutional proscription of unreasonable seizures; it has no relevance to the proscription of unreasonable searches antecedent to the seizures.[9]

What the Fourth Amendment protects is the individual's right of privacy against unreasonable governmental intrusion.

> "It is now well settled that 'the Fourth Amendment's right of privacy has been declared enforceable against the States through the Due Process Clause of the Fourteenth' Amendment. *Mapp* v. *Ohio*, 367 U.S. 643, 655 (1961). 'The security of one's privacy against arbitrary intrusion by the police—which is at the core of the Fourth Amendment—is basic to a free society.' *Wolf* v. *Colorado*, 338 U.S. 25, 27 (1949). And its 'fundamental protections

---

[7] *See United States* v. *Rabinowitz*, 339 U.S. 56, 75 (1950) (Frankfurter, J., dissenting); *Davis* v. *United States*, 328 U.S. 582, 612 (1946) (Frankfurter, J., dissenting).

[8] *See, e.g., Harris* v. *United States*, 390 U.S. 234 (1968); *Ker* v. *California*, 374 U.S. 23 (1963); *Carter* v. *Commonwealth*, 209 Va. 317, 320, 163 S.E.2d 589, 592 (1968), *cert. denied*, 394 U.S. 991 (1969); *One 1963 Chevrolet Pickup Truck* v. *Commonwealth*, 208 Va. 506, 158 S.E.2d 755 (1968).

[9] "It is unconstitutional to make an improper search even for articles that are appropriately subject to seizure when found by legal means. . . . Thus, the seizure of items properly subject to seizure because in open view at the time of arrest does not carry with it the right to search for such items." *United States* v. *Rabinowitz*, 339 U.S. 56, 75 (1950) (Frankfurter, J., dissenting).

. . . are guaranteed . . . against invasion by the States.' *Stanford* v. *Texas*, 379 U.S. 476, 481 (1965). This right has most recently received enunciation in *Camara* v. *Municipal Court*, 387 U.S. 523. 'The basic purpose of this Amendment, as recognized in countless decisions of this Court, is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials.' At 528." *Berger* v. *New York*, 388 U.S. 41, 53 (1967).

It is with respect to constitutionally protected zones of privacy that the constitutional contours of the "plain view" seizure doctrine must be ascertained. In determining whether the doctrine is applicable to a particular visual discovery and seizure, it is necessary to consider the discovery and seizure in terms of their geographical relationship to protected zones of privacy. Four factual situations illustrate the point.

The first is where the object was discovered and seized in an area outside a protected zone of privacy.[10] Since Fourth Amendment protections are inapplicable, the "plain view" doctrine is inapplicable.

The second is where officers outside a protected zone acquire probable cause to search the area by visually observing an object inside or being taken into the protected zone.[11] Here, the "plain view" seizure doctrine is inapplicable because the admissibility of the visually discovered evidence turns upon whether entry was constitutional.

The third is where officers, having pre-existing probable cause to search for objects relating to a particular crime, illegally enter a protected zone and then visually discover those objects.[12] Since entry was illegal, the "plain view" doctrine cannot validate seizures made here.

The fourth situation is where, after legal entry into a protected zone, the officer visually discovers a seizable object. Since entry is valid, the constitutionality of the seizure is the only issue to be determined. This is the situation where the "plain view" seizure doctrine becomes applicable. "What the 'plain view' cases have in common is that the police officer in each of them had a prior justifi-

[10] *Hester* v. *United States*, 265 U.S. 57 (1924); *Patler* v. *Commonwealth*, 211 Va. 448, 177 S.E.2d 618 (1970) (object found in an "open field").

[11] *Compare McDonald* v. *United States*, 335 U.S. 451 (1948) (gambling paraphenalia observed through a transom) *with Steele* v. *United States*, 267 U.S. 498 (1925) (contraband alcohol observed being taken into house).

[12] *See Chapman* v. *United States*, 365 U.S. 610 (1961).

cation for an intrusion . . ."[13]  *Coolidge* v. *New Hampshire*, 403 U.S. 443, 466 (1971).

This is the first of the two prongs in the "plain view" seizure test articulated by Mr. Justice Stewart for the plurality. As a threshold standard, this prong has not been faulted.

The second prong of his test is that "the discovery of evidence in plain view must be inadvertent." *Coolidge* v. *New Hampshire*, 403 U.S. at 469. This prong, approved by a plurality of four, was strongly criticized by the four dissenting justices.[14] In the case at bar, my brothers neither adopt nor reject the "inadvertence" prong. Respectfully, I would reject it and adopt an alternative. I would do so for a number of reasons.

The inadvertence test is viable only to the extent its application promotes the Fourth Amendment's purpose of protecting the individual's right of privacy against unreasonable governmental intrusion. Once it is determined that a protected zone of privacy has been invaded by a valid entry, it remains to be determined whether the nature and extent of the discovery and seizure of evidence meet the constitutional "reasonableness" standard. The nature and extent of the invasion must be determined objectively from the facts and circumstances of each case.[15] But the "inadvertence" test is a subjective test. Inadvertence is a state of mind. An individual hardly feels that his Fourth Amendment rights have been less invaded because the intruder had an inadvertent state of mind.

What is "inadvertence"? Qualitatively and quantitatively, it yields to no objective measure; it defies proof of its negative; and it invites counterfeit proof of its affirmative. The cases upon which Mr. Justice Stewart relies[16] shed little light. Factually, each reflects some element of fortuity in discovery of the evidence seized, but each case varies from the others in nature or degree of fortuity. Collectively, they provide no precise, objective definition of the criterion state of mind. A test that cannot be objectively and consistently applied by the courts cannot effectively promote the fundamental purpose of the Fourth Amendment.

Much less can such a test guide officers in the field. While judges attempt to decide case by case, "How inadvertent is inadvertent?",

---

[13] *Frazier* v. *Cupp*, 394 U.S. 731 (1969); *Harris* v. *United States*, 390 U.S. 234 (1968); *Ker* v. *California*, 374 U.S. 23 (1963).

[14] *Coolidge* v. *New Hampshire*, 403 U.S. 443, 505-10 (Black, J., concurring and dissenting) (joined by Burger, C.J., and Blackman, J.), 513-22 (White, J., concurring and dissenting) (joined by Burger, C.J.) (1971).

[15] *See Terry* v. *Ohio*, 392 U.S. 1, 20-21 (1968).

[16] *See Coolidge* v. *New Hampshire*, 403 U.S. 443, 465-66, 469-70 n.26 (1971).

police officers must attempt to tailor their conduct to judicial guidance. If such guidance leaves them uncertain how to proceed in a given situation, they may err by commission or omission. Of course the good faith efforts of "zealous officers" must yield to the strictures of the Fourth Amendment. *See Johnson* v. *United States*, 333 U.S. 10, 13-14 (1948). But good faith zeal should not be unnecessarily chilled by exacting a test which cannot be confidently applied.

In yet another way the unverifiable quality and quantity of "inadvertence" tends to undermine the Fourth Amendment's fundamental purpose. Courts should encourage police to maintain a high degree of professional integrity; but a court-imposed stricture that an incriminating object cannot be seized if the slightest reason to suspect its presence precedes its discovery will tend to foster, in the most scrupulous officer, a convenient lapse of memory. An officer who has made a good faith and justifiable arrest may, out of a mistaken sense of duty, feel pressed to offer slanted testimony concerning his state of mind at the moment he seized the evidence. Already over-pressed, officers should be and can be spared such unnecessary pressure as the "inadvertence" seizure test imposes.

As an alternative to the "inadvertence" test I suggest an "absence of probable cause" test. Under this test, when an officer lawfully enters a protected zone of privacy and visually discovers an object he has probable cause to believe is inherently related to criminal activity or extrinsically related to a particular crime,[17] he may seize it if before discovery he did *not* have probable cause to search for that object; if before visual discovery he had probable cause to search for the object discovered after lawful entry, seizure must await a determination by a magistrate that probable cause to search and seize judicially exists, unless seizure is justified under one of the carefully defined exceptions to the warrant requirement.[18]

The alternative test I suggest can achieve Fourth Amendment goals and avoid the pitfalls I perceive in the "inadvertence" standard.

---

[17] "There must . . . be a nexus—automatically provided in the case of fruits, instrumentalities or contraband—between the item to be seized and criminal behavior. Thus in the case of 'mere evidence,' probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction. In so doing, consideration of police purposes will be required." *Warden* v. *Hayden*, 387 U.S. 294, 307 (1967).

[18] A non-exhaustive inventory of such exceptions includes search incident to arrest, "exigent circumstances" and consent to search. Here, consent to search for the fugitive Hodges would validate a warrantless seizure of evidence visually discovered *within the permissible scope* of that search. The same is true with respect to a search incident to arrest of the three suspects.

Probable cause, an objectively verifiable standard, comes to this context with a long history of Fourth Amendment service. It has been the traditional talisman for the constitutional validation of searches and seizures. The judiciary is experienced in ascertaining and applying the standard, and police officers are experienced in adapting law enforcement techniques to the constraints of the standard. Use of this standard would not only minimize the burden of judicial administration but minimize, simplify, and clarify rules governing an officer called upon to make an instantaneous judgment in a climate of crisis. And since the standard is not subjective, it offers no inducement at trial to contrive "state of mind" testimony.[19]

Applying such a test to the record here, it is apparent first, that Carter's consent validated the officers' entry into the apartment, a protected zone of privacy. Prior to visual discovery of the container and drugs near the trash bags, the officers did not have probable cause to search the apartment for drugs. Their recognition of the two capsules as controlled drugs and the container as a wholesale container gave them probable cause to believe that a criminal offense was being committed in their presence. The two capsules thereupon became contraband and the container became evidence of a specific criminal offense. Therefore, seizure of the two capsules and container was a constitutionally valid "plain view" seizure.

Second, considering in context with this discovery the noises heard during the inordinate delay in answering the knock on the door, at this point probable cause to search the entire apartment for other contraband drugs and drug-related evidence came into being. The existence of this probable cause to *search* terminated the authority of officers having such probable cause to make other warrantless *seizures* of drug related evidence not justified under one of the exceptions to the warrant requirement.

## VI. *SEARCH INCIDENT TO ARREST: CHIMEL*

Since the Commonwealth failed to show that subsequent to the original seizure any of the seizures were validated by the "plain view" doctrine, we consider next whether any may have been valid as made in a search incident to a lawful arrest.

The Supreme Court has expounded the outer constitutional limits of a search incident to a lawful arrest in the arrestee's dwelling. The

---

[19] This test promotes the primary purpose of the "inadvertence" standard articulated by Mr. Justice Stewart, viz., prevention of the expansion of the "plain view" seizure doctrine to validate pre-planned "plain views". *See Coolidge v. New Hampshire*, 403 U.S. 443, 469-71 and nn.26 & 27 (1971).

officer may "search the person arrested in order to remove any weapons. . . . and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule." *Chimel* v. *California*, 395 U.S. 752, 763 (1969). Any search beyond the person of the arrestee must be justified by certain circumstances, viz., danger to the officer, danger of escape, or danger of concealment or destruction of evidence related to the particular crime for which the arrest was made.[20]

Here, at the time of arrest the officers could search the person of the three arrestees. Possibly, such a search was conducted. If so, seizure of some of the evidence, if found in an "area into which [the arrestees] might reach",[21] could be justified on a "search incident" rationale. But none of the three officers present at the time of arrest testified that any of the three arrestees were searched, and we can not presume from a silent record that any of the evidence seized was discovered in a search incident to arrest.

## VII. *"EXIGENT CIRCUMSTANCES"*

To justify a warrantless search and seizure, the Commonwealth has the burden of proving that the police acted under "exigent circumstances". On appeal, the Commonwealth urged two circumstances, viz., a threat to the safety of the officers and the danger of destruction of evidence. The record before us supports neither.

Nothing in the record shows that the five officers were apprehensive of their safety. True, one officer testified that the arrest was delayed because "several things . . . had to be taken into account just for our own safety." But he did not say what those things were or in what manner or degree they threatened their safety.

The Supreme Court has frequently recognized "hot pursuit of a felon" as a circumstance threatening the safety of the pursuing officer and therefore an "exigent circumstance" justifying a search of a protected area of privacy for weapons. *See Vale* v. *Louisiana*, 399

---

[20] The Supreme Court has recently held that such circumstances need not be shown to validate a search of the arrestee's *person* incident to a valid custodial arrest. *United States* v. *Robinson*, 414 U.S. 218 (1973).

[21] I construe "the area into which an arrestee might reach" to be the area in the vicinity of the arrestee into which he might reach while the arresting officer is exercising the vigilance and physical control over the arrestee required by the circumstances.

U.S. 30, 35 (1970). In the leading case of *Warden* v. *Hayden*, 387 U.S. 294, 298-99 (1967), the Court said:

"The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others. Speed here was essential, and only a thorough search of the house for persons and weapons could have insured that Hayden was the only man present and that the police had control of all weapons which could be used against them or to effect an escape. . . . The permissible scope of search must, therefore, at the least, be as broad as may reasonably be necessary to prevent the dangers that the suspect at large in the house may resist or escape."

But in *Hayden* where the search and seizure was upheld, the officers were in hot pursuit, entering the house only minutes behind the suspects; here, the officers were three hours behind the fugitive Hodges and had no direct evidence he was in the apartment. In *Hayden* the officers knew the suspects were armed; here, not so, and no weapons were ever seized. The five officers who entered the apartment were armed, and shortly after entry they learned that Hodges posed no immediate danger. He was not there. And three other armed officers stationed at the front and rear of the building were prepared for any danger his return might pose. From the time the officers arrived until the search ended approximately three hours later, several officers were allowed to leave the apartment. One testified that "there wasn't any use in me staying, they had the situation under control". The record does not show that apprehension for their safety actuated these officers in making the prolonged, methodical search conducted here.

Manifestly, the Commonwealth did not carry its burden of proving that a threat to the safety of the officers constituted an "exigent circumstance".

Nor is the evidence sufficient to prove that the search was justified by a danger of destruction of evidence. The record shows that "[t]he goods ultimately seized were not in the process of destruction." *Vale* v. *Louisiana*, 399 U.S. at 35. Neither does it appear that destruction, removal, or concealment was "imminent", *United States* v. *Jeffers*, 342 U.S. 48, 52 (1951), or that "the exigencies of the situation made [a warrantless seizure] imperative." *McDonald* v. *United States*, 335 U.S. 451, 456 (1948).

The quality of urgency implicit in the language of these cases is not reflected in the facts and circumstances of this record. There were five officers in a two-room apartment with three suspects. Within 15 minutes after the initial seizure, the three suspects were placed in the custody of one officer in one room (where no evidence was found) while the other officers searched the other room. Much of the evidence discovered there during the first hour of the search was left in place to be collected by an officer who did not arrive until more than an hour after the search was begun; that collection continued for more than an hour and a half after the suspects were taken to the police station; and still further evidence was recovered under a search warrant some ten hours after the suspects were incarcerated. Clearly, there was no destruction of evidence and no apparent threat of destruction.

Accordingly, the Commonwealth failed to carry its burden of proving any "exigent circumstances" justifying the warrantless search and seizure.

## IX. "HARMLESS ERROR"

On appeal, the Commonwealth argues that if any evidence was unconstitutionally seized, its admission at trial was harmless error. Since the constitutional question is federal, we look to the federal rules as pronounced by the Supreme Court.

In *Chapman* v. *California*, 386 U.S. 18, 24 (1967), the Supreme Court held that federal constitutional error in a state prosecution can be harmless but said:

> "There is little, if any, difference between our statement in *Fahy* v. *Connecticut* about 'whether there is a reasonable possibility' that the evidence complained of might have contributed to the conviction' and requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. We, therefore, do no more than adhere to the meaning of our *Fahy* case when we hold, as we now do, that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."

Applying the *Fahy-Chapman* mandate, when evidence seized in violation of the Fourth Amendment is admitted at trial and, on appeal, the Commonwealth argues "harmless error", the burden is on the

Commonwealth to convince us beyond a reasonable doubt that the erroneous admission of evidence was harmless.

The court does not decide whether any specific item of the evidence introduced was seized in violation of the Fourth Amendment but only that, except with respect to the two seconal capsules and container, the evidence was inadmissible because the Commonwealth failed to carry its burden of proving that any of the 7000 objects admitted in evidence were seized in compliance with the constraints of the Fourth Amendment. Even the objects seized under the delayed search warrant were never segregated and identified as such below. It may be that evidence in the new suppression hearing will prove that some of the warrantless seizures were constitutionally permissible; but *the record before us* does not so prove. Significantly, it does not prove the validity of the seizure of the evidence upon which the trial court expressly relied, viz., Lugar's parole board order and the Mickey Mouse electric watch box discovered inside a disposable diaper box. Clearly, this evidence contributed to the conviction.

If the two seconal capsules and container which were constitutionally seized were introduced in evidence (and it cannot be determined from the record that they were), the record does not show that they were ever identified apart from the other objects introduced. We do not know if those items were stolen from one drugstore, both drugstores, or neither drugstore, and it cannot be presumed from a silent record that they were evidence of *both* burglaries of which Lugar was convicted. And the Mickey Mouse electric watch, the only evidence shown by the record to have been found on Lugar's person, could have been stolen from only *one* of the drugstores.

For these reasons, I agree with my brothers that the Commonwealth did not carry its burden of showing that much of the evidence introduced at trial was constitutionally seized or that the introduction of such evidence was harmless error beyond a reasonable doubt.